# Berks County *v.* Reading City Passenger Railway Co. & Reading Traction Co., Appellants.

### [Marked to be reported.]

*Street railways—Acceptance of act of May 14,* 1889.

Section 20, of the act of May 14, 1889, P. L. 211, relating to the acceptance of the act by street railway companies previously organized, was intended to provide a new and complete system for the organization of street railway companies, and it is the only general law in force upon the subject in this state.

It was intended to afford a way for companies organized under laws that were invalid to secure a lawful corporate character, and also to open a way for companies legally organized under special acts of assembly to surrender their special privileges and obtain those provided by the statute.

The words "under color of" in the connection in which they stand in the 20th section of said act must be read as equivalent to the words "under authority of;" and they apply, not merely to companies organized under defective laws, but to those organized under special acts which are valid.

*Street Railways—Consent of county to use of bridge.*

County commissioners may require, as a condition of their consent to the use of a county bridge by a street railway, that the railway company shall bear the expense of strengthening the bridge, assume the cost of

repairs and pay a reasonable rental; and where they have entered into a written agreement with a street railway company to give it the use of a county bridge without making provision for strengthening and repairing the bridge or paying a rental therefor, and have subsequently notified the company that they will not be bound by the agreement, the company will be restrained by injunction from taking forcible possession of the bridge.

*Street railways—Bridge—Refusal of county commissioners to permit use of bridge.*

Where the proper local and municipal authorities have given their consent to the use of a county bridge by a street railway company, the county commissioners cannot arbitrarily refuse the use of the bridge to the company.

If they refuse their consent the court may appoint an engineer to examine and report what will be necessary to strengthen the bridge for street railway traffic, and, upon the filing of his report, the court may permit the street railway company to enter upon the bridge and strengthen it, and when this has been done to the satisfaction of the court the company may use the bridge for the purposes of its business, upon giving security to keep it in repair, pay the rental agreed upon, and perform the conditions upon which the municipal consent was given.

Argued March 7, 1895. Appeal, No. 265, Jan. T., 1895, by defendants, from decree of C. P. Berks Co., 1894, No. 606, in favor of plaintiff on bill in equity. Before WILLIAMS, MC-COLLUM, MITCHELL, DEAN and FELL, JJ. Decree modified.

Bill in equity to restrain a street railway company from constructing its tracks upon a bridge.

The facts appear in the following opinion of the court below by ENDLICH, J.

### FINDINGS OF FACT.

"1. The Penn Street Pass. Ry. Co. was incorporated by act April 3, 1873, P. L. (1874) 346, with power to construct a single or double track road on Penn street, in the city of Reading, from the Harrisburg bridge on the west to Nineteenth street on the east.

"The Reading City Passenger Railway Company was incorporated by act, December 18, 1873, P. L. (1874), 463, with power to occupy with its main tracks and specified branch tracks certain other streets in said city. The former company was subsequently merged in the latter, which, on March 16, 1893, filed an acceptance of the provisions of the act May 14, 1889, P. L. 211, under section 20 thereof, received letters pat-

ent, dated March 17, 1893, as provided therein, and on April 1, 1893, leased its rights, privileges, property and franchises for the period of 99 years to the Reading Traction Company, incorporated March 9, 1893, under act March 22, 1887, P. L. 8.

" 2.  On December 18, 1893, the directors of the Reading City Passenger Railway Company, which then had a double track road on Penn street, down to the foot of the eastern approach of the Harrisburg bridge, nearly midway between Front and Second streets, and a single track (unused and unprovided with appliances necessary for the use of trolley cars) running up said approach to the point where the iron structure of the bridge begins, resolved to construct an ' extension, beginning at the intersection of Front and Penn streets, thence by double track, westward on the line of Penn street, crossing the Harrisburg bridge to the western bank of the Schuylkill river,' and authorized the officers of the company to take all steps necessary to carry said resolution into effect.  A copy of the minutes reciting this action was, on the same day, recorded in the office of the recorder of this county, and an exemplification of said record filed December 27, 1893, in the office of the secretary of the commonwealth.

" 3.  On the day last mentioned, the Reading City Passenger Railway Company and the Reading Traction Company, and the then county commissioners of the county of Berks, executed the following instrument:    .

" Articles of agreement made and entered into this twenty-seventh day of December, A. D. one thousand eight hundred and ninety-three, between the county of Berks, in the state of Pennsylvania, of the first part, and the Reading City Passenger Railway Company and the Reading Traction Company, corporations existing under the laws of Pennsylvania and located in the city of Reading, in the county of Berks, of the second part, each party covenanting for itself, its successors and assigns, with the other party, its successors and assigns.

" Whereas, the public convenience requires the extension of street railways beyond the limits of the city of Reading; and

" Whereas, to reach the townships adjoining and lying to the west of the city, it is necessary to cross the county bridge at the foot of Penn street, known as the Harrisburg bridge; and,

" Whereas, the parties of the second part are duly authorized to extend their line on Penn street to the west bank of the Schuylkill river ;

" Now therefore this agreement witnesseth : *First.* That the consent and right to lay a double track of iron or steel rails upon and across the said bridge and the approaches thereto, and to string electric wires along the top of said bridge within the spans thereof, and upon span wires to be supported by neat wooden poles upon the eastern approach thereof, and by ornamental wooden poles upon the western approach thereof, be and are hereby granted by the county of Berks to the Reading City Passenger Railway Company and the Reading Traction Company, to be used by their cars, propelled by electricity or any other motive power other than by locomotive.

" *Second.* That the rails to be laid on said bridge shall be of the standard tram bridge rail pattern, and the gauge thereof shall be five feet two and one half inches.

" *Third.* The cars of the parties of the second part shall not have the right of way in crossing said bridge in preference to any vehicle, animal or thing which may be rightfully upon the same track or moving in the same direction, and shall not at any time be propelled at a greater speed than at the rate of four miles an hour, nor shall more than one car or train of cars be upon the bridge at one time.

" *Fourth.* That nothing in this grant or contract contained shall be construed or taken to obligate the county of Berks to maintain said bridge for the use of the parties to whom this grant is made, or for the purpose to which this contract relates, nor to render the county liable for any injury to person or property resulting directly or indirectly from the use of said bridge for the purpose covered by this agreement.

" *Fifth.* And in consideration of the grant aforesaid, the said Reading City Passenger Railway Company and the Reading Traction Company, or either of them, shall pay to the county of Berks the sum of $600, annually, in quarterly payments of $150 each, said sum or sums to be applied to keeping the said bridge in repair, the said payments to begin the first quarter after the completion of the tracks upon said bridge, and to continue as long as the cars of the said parties or either of them shall run across or over the said bridge ; and the failure to run

the cars thereon, for the convenience of passengers, for any period of three consecutive months, shall be taken as an abandonment of the line and a surrender of the right herein granted, and this agreement shall thereupon become void and of no effect.

" *Sixth.* This grant to be void unless the right is exercised within one year from the date hereof.

" In witness whereof, the commissioners of the county of Berks have hereunto set their hands and affixed the seal of the county of Berks, and the presidents and secretaries of the parties of the second part have hereunto set their hands and affixed the corporate seals respectively of the Reading City Passenger Railway Company and the Reading Traction Company on the day and year first above written.

" 4. By resolution approved January 16, 1895, the councils of the city of Reading consented to the extension of its tracks by the Reading City Passenger Railway Company over said bridge, the limits of said city extending to the western bank of the Schuylkill river.

" 5. At a distance of about one block from the western extremity of the Harrisburg bridge there is an unincorporated settlement known as West Reading, containing 800 to 1000 inhabitants, a hat factory, grist mill, carriage factory, several brick yards, stores, etc., and waterworks with about 150 consumers. Many of the employees in the industries referred to reside in the city of Reading. The extension of a railway from the said city to this settlement would be a convenience to such employees as well as to the persons residing in the settlement. The space intervening between the same and the Harrisburg bridge consists, upon the one side of the highway, of filled-up ground claimed by the P. & R. R. R. Co., and upon the other bluff, known as Leinback's Hill, of a solid mass of rock. [The extension of the Reading City Passenger Railway Company's road to the western extremity of the Harrisburg bridge only, can be of no material advantage or service to the persons residing or laboring in West Reading or points beyond.] [7]

" 6. By letters patent, dated March 10, 1894, the Reading & Womelsdorf Electric Railway Co. was incorporated, to construct an electric railway from the western bank of the Schuylkill river, at a point opposite the city of Reading, where the

Harrisburg bridge crosses the said river, westwardly upon the Dauphin turnpike, passing through part of West Reading and ending at Womelsdorf. Contracts for the equipment and construction of said road by June 1, 1895, have been made; if and when this road is constructed it is the intention of the defendants to connect their tracks with the same. [But as yet the consent of all of the local authorities of not a single township through which the Reading & Womelsdorf road must pass, has been obtained for its construction.] [8]

" 7. In April, 1894, the county commissioners being about to lay a new floor upon the Harrisburg bridge, the president of the Reading Traction Company, by letter of April 10, 1894, addressed to the said commissioners, invited them to confer with him concerning the kind of rail to be laid by the company upon the bridge, the method of adjusting the same to the new flooring, etc. [The commissioners made no response to this letter, and a desire, orally expressed by said president to one of the commissioners about the same time, to meet the commissioners concerning the matters referred to, was refused, with the statement that the commissioners had nothing to do with the Traction Company and the latter had no business on the bridge.] [9]

" 8. During the night of November 28–29, 1894, the officers of the defendant companies, knowing that the county repudiated the agreement of December 27, 1893, and anticipating an attempt on its part to apply for an injunction if they proceeded in daytime, went with their employees upon Harrisburg bridge with rails and appliances for laying them and laid upon the floor of the bridge as they found it a double track, of the gauge specified in the instrument of December 27, 1893, fastening each rail to the floor by a spike at either extremity of the rail, a washer being placed over the counter-sunk holes of the rails, through which the spikes were driven into the floor, to prevent the heads of the spikes from being pounded down by wheels passing over them and thus becoming more difficult to extract. The rails used were new ones of an appropriate pattern for the construction of tracks upon bridges and designed to be fastened by screws. In order to lay them properly it was necessary either to cut out a groove into the floor planks to accommodate the 'lip' of the rail (a projection at the inner edge of the bottom

of the rail designed to be imbedded in the woodwork beneath it and thus protect the rail from lateral displacement), or to place under the rail a strip of wood or metal equal in thickness to the depth of the 'lip,' thus giving the rail a flat under surface, and dispensing with the necessity of a groove to accommodate the 'lip.' Neither of these things was done in the laying of the rails upon this bridge, so that they do not lie flat upon the floor of the bridge, but tilted slightly upward at the inside edge and outward at the outside edge. Nor, although it is claimed on behalf of the defendant companies, that their purpose was to put strips of steel under the tracks, so as to make them level without sinking the 'lip' into a groove (which would weaken the flooring of the bridge), had or have any such strips been provided. Neither have the rails been connected with binding wires, necessary to make an electrical circuit. Nor can the strips referred to, or the binding wires, be put in, or the track made available for use, without being entirely taken up and relaid.

" [9. The object and intent of the defendant companies' entry upon the bridge on the night of November 28–29, 1894, and of the work there done and meant to be done by them during that night, were not the construction, or the beginning of the construction, of a railway to be immediately completed and thenceforth used by said companies in connection with and as part of their electric railway system in the city of Reading, but the accomplishment of an occupation of the bridge in advance of the possibility of stoppage by judicial process and within a year after the agreement with the commissioners; the completion of the tracks thereafter as a road capable of being used for the passage of electric cars, and the defendants' use of the same for that purpose being designed to be deferred until and dependent upon the contingency of the construction of the Reading & Womelsdorf Railroad; and the use then and in that event intended to be made of said tracks being that of running electric motor cars over the same.] [10]

"10. The Harrisburg bridge, though almost wholly within the limits of the city of Reading, has, since its construction many years ago, been a county bridge, under the control of the commissioners of Berks county. It is the only bridge crossing the Schuylkill from the western extremity of Penn street, and

being a free bridge, is continuously and uninterruptedly being used by the public, in vehicles and on foot.

"11. As rebuilt in 1885, said bridge is an iron structure of three spans, aggregating 553 feet seven inches, extending across the tracks of the Wilmington and Northern, the West Reading, and the Pennsylvania Schuylkill Valley Railroad, the Union canal, and the Schuylkill river, to the western bank thereof. Including the approaches, the eastern one of which (already occupied with one track; see second finding) begins at a point on Penn street, nearly midway between Front and Second streets. The total length of the bridge is about 938 feet. The width of the driveway of the bridge is twenty-six feet. On either side of the same and somewhat higher than it, there is a footwalk of seven feet two inches in width. Since June, 1894, the floor of the bridge (which before that time consisted of a double course of hemlock and pine planks) has been one course of three-inch oak planks, twelve and one half feet long. This floor rests upon eight iron stringers, running longitudinally, three feet apart, and joined together, at intervals of eighteen feet one and one half inches, by iron cross girders. The floor is calculated to be and is capable of bearing a uniform distributive weight of 100 pounds per square foot of floor surface. The cost of keeping the bridge, used as it has been in the past, in proper and safe repair, is slightly over $1,000 per annum.

"12. As at present laid, the distance between the right-hand track and the footwalk on the north side of the bridge is five feet one inch. The northern rail of said track lies immediately over the second stringer. The distance between that rail and the other rail of the same track is five feet two and a half inches; that between the right-hand track and the left-hand track is four feet, the latter track being also of a gauge of five feet two and a half inches, and leaving between its southern rail and the southern sidewalk six feet six inches.

"13. The tracks being arranged as stated, the strain upon the floor of the bridge, including woodwork and ironwork, of any ordinary loaded electric motor, within the area of its wheel bases, will be over 100 per cent greater than good engineering indicates as a safe and proper limit. A change in the arrangement of the tracks, so as to relieve the second string-

er of some of the strain put upon it by placing a rail immediately over it, and thus to distribute some of the load placed upon it to the stringers next on either side, might reduce this excess by approximately one third.

" [14. Under any possible arrangement of the tracks and with two courses of planking instead of a single course only, the strain upon the bridge floor resulting from the passage of electric motor cars, run as contemplated by the agreement of December 27, 1893, is greatly in excess of the safe capacity of the bridge, and will tend to increase the cost of maintaining the bridge, and to weaken and eventually destroy the iron structure of said floor.] [11]

" 15. It is possible to strengthen the floor of the bridge (in such a way as practically to amount to the putting in of a new floor, i. e., by doubling the number of stringers, etc.) sufficiently to make it capable of bearing the strain resulting from the use of electric motor cars.

" [16. The presence of a double track upon said bridge will make it necessary for wagons to use said tracks, and by reason of the narrowness of the space to the side of the tracks will make it impossible for wagons heavily loaded to turn out of said tracks while on the bridge. It will therefore be impracticable for persons taking loads of hay over said bridge to pass an electric car crossing the bridge at the same time, i. e., such persons will be virtually debarred from the use of said bridge.] [12]

" Under these findings of fact and as applicable to them I make the following

" FINDINGS OF LAW.

" (a) The Reading City Passenger Railway Company is not invested with the powers conferred by the act May 14, 1889, P. L. 211, upon street railway companies incorporated under the same. [13]

" (b) The said company, on December 27, 1893, had no right to extend its road or tracks upon and over the Harrisburg bridge or beyond the point to which, under the act of April 3, 1873, P. L. (1874), p. 463, incorporating the Penn Street Passenger Railway Company, the latter company was authorized to construct its road; nor had or has the Reading Traction Company any right to build such extension under the act under which it is incorporated. [14]

" (c) The Reading City Passenger Railway Company, on December 27, 1893, having had no right to extend its track over and upon the Harrisburg bridge, the then commissioners of Berks county had no right to agree with said company and the Reading Traction Company for or respecting such extension, and the agreement of that date was ultra vires on both sides. [15]

" (d) If the Reading City Passenger Railway Company may be treated as a corporation under act 14th May, 1889, and entitled to its benefits, and particularly to the benefit of the provisions of section IV thereof, relating to extensions of tracks, the power attempted to be exercised by said company, and its lessee, the Reading Traction Company, in the occupation of the Harrisburg bridge in the manner and for the purposes disclosed by the facts of this case, is not among the powers conferred by that enactment, and therefore does not exist in said companies. Not existing by virtue of said enactment, that power is not conferred upon said companies by the agreement of December 27, 1893. [16]

" (e) The said agreement of December 27, 1893, being in effect on the part of the county commissioners, a surrender of public property to a corporation without compensation proper to be paid to said county by such corporation for the same, and a dedication of a public bridge to a use inconsistent with the free use of the bridge by the public to which it is by law dedicated, is of no binding force upon the county, and confers no rights as against it upon the defendant companies. [17]

" (f) The attempted occupation of the Harrisburg bridge by defendants was not a bona fide exercise within the meaning of act 1889, section 16, of any power conferred by said act, or any right given by the agreement of December 27, 1894. [18]

" (g) The tracks laid upon the Harrisburg bridge by the defendant companies are an obstruction of a public highway, and their presence is an interference with the rights of the county in the control and management of said bridge. [19]

" (h) The plaintiff is entitled to a decree in accordance with the prayer of its bill." [20]

The court entered the following decree:

[And now, to wit, February 11, 1895, this cause came on to be further heard, and was argued by counsel, and thereupon, upon consideration thereof, it was ordered, adjudged and decreed

that the defendants and each of them, their and each of their servants, agents and workmen, be enjoined from constructing or completing or proceeding with the construction of a track or tracks on, upon or over the Harrisburg bridge, and to remove therefrom the rails or tracks already placed or fastened by them upon the floor of said bridge, leaving the same in as good repair as it was in when, and immediately before, the said rails or tracks were placed or fastened thereon, and that the defendants pay the costs of this suit.] [3]

*Errors assigned*, among others, were (1) in not dissolving the preliminary injunction; (2) in not dismissing plaintiff's bill; (3) decree of the court, quoting it; (7–20) findings of fact and law as above, quoting them.

*Richmond L. Jones*, *C. H. Schaeffer* with him, for appellant.— The court having found, as a fact, that the Reading City Passenger Railway Company, defendant, was incorporated under the act of May 14, 1889, P. L. 211, by letters patent duly issued, is bound to regard it as a corporation under the act, so far as third persons are concerned, until it is dissolved by a judicial proceeding on behalf of the commonwealth: Act of June 19, 1871, P. L. 1361; Western Penna. R. R. Co's. App., 104 Pa. 399; Germantown Ry. v. Citizens' Ry., 151 Pa. 142; Potts v. Quaker City Elevated R. R., 161 Pa. 396; Allegheny City v. Ry., 159 Pa. 415; Endlich on Statutes, sec. 34, 181; St. Louis v. Gorman, 29 Mo. 593; Bernal v. Glein, 33 Cal. 668; Com. v. Conyngham, 66 Pa. 99; Holl v. Dreshler, 71 Pa. 299; Lancaster Co. v. Lancaster City, 160 Pa. 411.

The Harrisburg bridge, having been erected for public travel and accommodation, is a public highway, and the construction of this street railway over it is reasonably consistent with the purpose for which it was erected: Pittsburg & West End Ry. v. Point Bridge Co., 165 Pa. 37; act of May 14, 1889, P. L. 211; Ry. Co. v. Phila., 164 Pa. 457.

The county commissioners having consented to the construction of the railway on the bridge on certain conditions, embodied in the agreement, which conditions were accepted when the defendants signed the agreement, and none of said conditions having been broken, the contract cannot be avoided. The bill

lays no ground for breaking the contract, but simply raises the question of power to make it. The evidence offered relating to those conditions was inadmissible: Chitty on Contracts, 11 Am. ed. 466 ; Pittsburg & West End Pass. Ry. v. Point Bridge Co., 165 Pa. 37.

*William J. Rourke, W. Oscar Miller,* county solicitor, and *Harvey F. Heinley* with him, for appellee.—The Reading City Passenger Railway Company could not legally accept the provisions of the act of May 14, 1889, and consequently neither itself nor its lessee acquired any rights or franchises conferred by that act: Potts v. Quaker City R. R., 161 Pa. 396 ; Com. v. Erie & N. E. R. R., 27 Pa. 351; Com. v. Cent. P. Ry., 52 Pa. 506 ; Atty. General v. Lombard St. Ry., 1 W. N. C. 489 ; Penna. Ry. Co.'s App., 115 Pa. 525 ; Pa. S. V. R. R. v. P. & R. R. R., 157 Pa. 42 ; Bradbury v. Wagonhorst, 54 Pa. 180.

The court has the power under the act of June 19, 1871, to inquire into the question of the power of appellants to accept the act of May 14, 1889 ; Edgewood R. R. Co.'s App., 79 Pa. 257 ; Freeland v. Ins. Co., 94 Pa. 513 ; McCandless's App., 70 Pa. 210 ; Rhoads v. Building Assn., 82 Pa. 180 ; West. Penn. R. R. Co.'s App., 104 Pa. 399 ; Germantown R. R. v. Citizens' R. R., 151 Pa. 142 ; Potts v. Quaker City Elevated R. R., 161 Pa. 396 ; Weinman v. Pass. Ry., 118 Pa. 192 ; act of May 23, 1878, P. L. 111 ; Berks and Dauphin Turnpike v. Ry. Co., 5 Pa. C. C. 467.

The Harrisburg bridge as attempted to be used by the appellants is not a public highway under sec. 4 of the act of 1889, and an occupation of this kind is not a bona fide exercise under sec. 16, act of 1889, P. & W. E. P. Ry. v. Point Bridge R. R., 165 Pa. 37 ; Del. Co. Ry. v. Phila., 164 Pa. 457 ; Edgewood R. R. Co.'s App., 79 Pa. 257.

Although the county commissioners under agreement consented to the construction of the railway upon the bridge, yet if the agreement is against public policy, or if the strength of the bridge is insufficient to support a street railway traffic, the agreement is void, and its provisions cannot be enforced : Chester Co. v. Barber, 97 Pa. 455 ; act of May 15, 1874, P. L. 185 ; act of April 13, 1843, Br. Purd. Dig. 1507, P. L. 84.

OPINION BY MR. JUSTICE WILLIAMS, March 25, 1895:

We are satisfied with the decree appealed from in this case, but we are not satisfied with all the reasons given for it by the learned judge of the court below. The findings of fact show that the Reading City Passenger Railway Company and the Penn Street Passenger Railway Company were incorporated in 1873, by a special act of assembly for each, in which the route to be occupied was plainly and specifically described. Each company entered upon the route assigned it. In 1893, the Penn Street Company was merged in the Reading City Company, so that the latter became the owner and operator of both routes. But the Harrisburg bridge over the Schuylkill river at Reading was not included in the route of either company, and under the charters of 1873, the Reading City Company had no means of extending its lines upon and over the bridge. In December, 1893, it accepted the provisions of the act of 1889 and a new charter was issued to it under section twenty of that act. The first important question is therefore over the effect of this action. The learned judge held it to be an idle ceremony which gave to the company none of the powers conferred upon companies incorporated under the provisions of that act, and for the reason that as the company was lawfully organized under a valid act of assembly, it was not within the letter or the spirit of the provisions contained in said section. It is clear that the act of 1889 was intended to provide a new and complete system for the organization and government of street railway companies in this state. After its approval by the governor, it became the only general law in force upon the subject, so that all companies thereafter organized would have exact uniformity of powers, privileges, and duties. At the end of this comprehensive system, we find the provision now to be interpreted. It declares that all companies theretofore incorporated under the act of 1878 (which had been held to be unconstitutional) and under the act of 1879 (which was subject to the same objection) and "any street passenger railway company heretofore existing under color of any charter or letters patent of the commonwealth, upon accepting the provisions of this act in writing under the seal of the corporation, filed in the office of the secretary of the commonwealth, shall thereupon become and be a body corporate hereunder,

and shall be entitled to, and have possession of, all the privileges, franchises and powers conferred by this act upon corporations to be created under this act, . . . . and the governor shall forthwith cause new letters patent under this act to issue to such corporation under the same name as the company had in the charter under which it was originally incorporated." We are of opinion that this provision was intended to afford first, a way for companies organized under laws that were invalid, to secure a lawful, corporate character; and next, to open the way for companies legally organized under special acts of assembly to lay off their special belongings and put on the uniform dress which the body of the statute had so carefully provided for the class of corporations to which they belonged.

The words " under color of " in the sentence that reads " any street passenger railway company heretofore existing under color of any charter or letters patent " were not happily chosen. They often mean what the learned judge held them to mean in this case, that the authority " under color " of which a thing is done is assumed, or defective. But their meaning like that of all words not purely technical must depend on the connection in which they stand, and the fixed character of the things to which they relate. In this provision the companies organized under defective laws had already been provided for. There were no " heretofore existing " companies left to be taken into account except such as had been organized under charters resting on special acts of assembly like those under which the Reading City Company was at that time acting. These charters and letters patent were valid, but they left the companies holding them to stand outside the class created by the act of 1889, and outside the operation of general laws to be thereafter passed as applicable to the class. The legislative intent was to reduce so far as possible the number of outstanding special charters and bring the entire street passenger railway business as rapidly as possible under the same system of management and control. To this end it was necessary to provide a way for existing street railway companies to surrender their special charters and secure new ones resting on the new general law. The words " under color of " must, in the connection in which they stand in the twentieth section of the act of 1889, be read as equivalent to the words " under authority of." This is neces-

sary to give effect to the legislative intent, and to open the way for any and all companies existing under charters or letters patent issued previously to the passage of the act, to come in under its provisions and avail themselves of its benefits.  The Reading City Railway Company by its surrender of its old charter and acceptance of the act of 1889 acquired, in the language of this section, the rights and powers of " a body corporate hereunder," and became entitled to " all the privileges, franchises and powers conferred by this act upon corporations to be created under this act, and all the properties, rights and privileges belonging to such corporation theretofore acquired by gift, grant, conveyance, municipal ordinance, assignment or otherwise."  In other words, it ceased to stand alone upon its special act of assembly, and passed with all its belongings under the general law.

Let us now, conceding the right of this company to extend its lines within the meaning of the act of 1889, inquire into its right to occupy the Harrisburg bridge.  This bridge belongs to the county of Berks and is under the control of the county commissioners.  It cannot be occupied without their consent, but that consent cannot be arbitrarily withheld.  It is in an important sense a part of the highway and its ownership by the county cannot be made use of to block the course of improvements or to extort unreasonable concessions.  The county is liable to the public for its safe condition, and the commissioners have a right to consider its strength, and to refuse to permit its use in a manner that would jeopardize the traveling public using it in the ordinary manner.  But if it can be made safe for use both by the public and the street railway company, the duty of the commissioners is to consider what is necessary for that purpose and in what way it can best be accomplished. The cost of the work found to be necessary, as well as the cost of repairs, they may require the company to pay or secure as a condition of its occupancy of the bridge.  In this case the company applied to the county commissioners and in December, 1893, obtained a contract from them for the occupancy of the Harrisburg bridge with their railway.  We have examined this contract.  It may be that it is somewhat improvident, but we are clear that it is not so grossly so as to justify the court in pronouncing it absolutely void for that reason.  The county

commissioners however, for some reason refused to be bound by it, and of this the railway company had actual notice. Nothing had been done under it by the company up to the time that its officers were made fully aware of the refusal of the commissioners to abide by it or to permit them to occupy the bridge. Under such circumstances if they regarded the contract as binding upon the county, the courts were open to them and it was their duty to settle the extent of their rights in an orderly manner. It seems doubtful upon the evidence now before us relating to the strength of•the bridge and its inability to stand the increased burden to be put upon it, whether a court of equity would have enforced this contract without imposing additional terms. The company probably entertained the same view of the situation. It accordingly decided to shove by the courts, seize the bridge, and attempt to defend under its contract. This it did in the night time and with a strong hand. This is a method of asserting property rights that courts do not favor. It is a race against the law which it is rarely, if ever, worth the while to run, and which if won, cannot often yield the winner any substantial advantage. This court has frequently condemned this disorderly and dangerous practice. One of its most recent utterances can be found in Easton Passenger Railway Co. v. Easton Borough, 133 Pa. 505.

The injunction was properly issued in this case because the seizure of the bridge was without the consent of the county commissioners and after notice that their consent had been withdrawn ; and because upon the evidence before us we cannot enforce the contract under which the company seeks to justify its entry upon the bridge. The strength of the structure does not seem to be sufficient to bear the additional burden without some changes or repairs. The decree is affirmed. The costs of the appeal to be paid by appellant.

Subsequently a motion was made to modify the decree entered in the court below.

OPINION BY MR. JUSTICE WILLIAMS, April 8, 1895:

We were at first inclined to refuse this application, and to look upon the ill-considered reply of the county commissioners to the letter of the defendants asking them to determine what

ought to be done in order to render the county bridge in question sufficiently strong to justify its use by their tracks, as the hasty expression of a litigant that the sober second thought would qualify in a proper manner. The answer now filed in this court shows that our confidence was not well founded and leads us all to conclude that some modification of our decree should now be made. This bridge, as we said in the opinion disposing of the appeal in this case, is a part of the highway for purposes of passage. The county owns it, not as a house or a farm is ordinarily held, for the benefit of the owner, but for the convenience and comfort of the traveling public. Because of the cost of its original construction, and of its maintenance, the burden of such construction and maintenance is lifted from the local subdivision of the county in which it is situated, and placed on the county at large. The county thus becomes liable for its proper construction and its safety as a part of the highway. In consequence of the duty so cast upon the county it is .clothed with the powers necessary to enable it to regulate the public use of the bridge so far as its own protection and the safety of those using it may require. The county cannot close it against the public, as an owner might shut up his house. It is bound to keep it open and in good repair. The proper local and municipal authorities within whose jurisdiction this part of the highway is located have given their consent to its occupancy by the defendant's railway, as we understand the facts. The question then arises, can the county which is a trustee for the public, and not an owner in its own right, arbitrarily refuse the use of the bridge for purposes which the proper local authorities have regularly authorized? There can be but one answer to this question. The control of the county relates to the structure, not to the highway. If the structure is insufficient to support the increased and lawfully authorized use of the highway of which it is a part, it is the duty of the county commissioners to say so, and to determine what ought to be done to strengthen and prepare the structure to meet the demands that will be made upon it. They may also within any reasonable limits regulate the manner of its use, and provide for its repair and a proper compensation by way of rental. Beyond this their power of control cannot be exercised to defeat the purposes of the local authorities who control the highway. The line that divides

the respective provinces of the county and the municipality so far as this subject is concerned is easy to trace and hard to mistake.

We shall amend our decree by adding the following paragraph to the end thereof.

And now April 8, 1895, it is further ordered adjudged and decreed that the record be remitted to the court below with direction to appoint, on the petition of the defendants, a competent engineer to examine the bridge described in the bill and report in writing to the said court its general condition and the extent of the repairs or supports that may be necessary to prepare it to support safely the defendants' street railway and its traffic in addition to the ordinary public travel.  After the report of the engineer has been made the defendants may apply to the court for the dissolution of the injunction so far as to permit them to enter upon the bridge with their employees and under the general supervision of the county commissioners, make the changes and repairs found by the court on the report of the engineer to be necessary.  When these are completed and that fact is made to appear to the satisfaction of the court below, the injunction heretofore directed will be dissolved upon the giving by the defendants of a bond in the sum of five thousand dollars with surety to be approved by the court, conditioned that the defendants will faithfully observe and abide by the terms and conditions relating to the manner of the use of said bridge by them, the repairs thereof, and the payment of rent therefor, which may have been or may thereafter be agreed upon by the parties or, in the absence of an agreement, may be determined upon by the court.

The costs of this motion to be paid by the county of Berks.