# Reading City Passenger Railway Company, Appellant, *v.* Berks County.

*Street railways—County bridges—Use of street railways—Agreements—Termination—Rights in new bridge—Reasonable rental—Police power—License fees—Appeals—Evidence—Harmless error—Equity.*

1. While the terms upon which a street railway company may use a county bridge are a matter of agreement, in the first instance, between the railway company and the county, and the railway company may not occupy the bridge without the consent of the county, that consent may not be arbitrarily withheld.

2. An agreement between a street railway company and a county relating to the manner of use of a county bridge and the rental to be paid for the franchise, terminates with the lawful demolition of the bridge by the county, and does not give rise to any rights on the part of the railway company in a new bridge thereafter built by the county.

3. While a street railway company which has acquired from a county the right to use a bridge of which the county is the owner

without payment of any rental, cannot thereafter be compelled to pay rental for the use of the bridge, and may only be required by the county, in the exercise of the police power, to pay such a license fee as will reasonably cover the cost of repairs, maintenance and supervision, necessitated by the extraordinary use to which the structure is subjected, the right to use a new bridge, in which the railway company has no vested interest, can only be acquired upon the reasonable terms and conditions imposed by the county. In such case the authority to demand and the obligation to pay are not referable to the police power.

4. In a suit in equity brought by certain street railway companies to enjoin a county from preventing the plaintiffs from running their cars over a bridge newly erected by the county, the defendant filed a cross-bill praying for a decree fixing the compensation to be paid by plaintiff for the use of the bridge. It appeared that the plaintiffs and defendant had previously, by agreement, fixed the annual rental to be paid for the use of a former bridge at $600, and that this bridge had been lawfully demolished, and that a new bridge had been erected by the county at a cost of more than $575,000. The court admitted evidence as to the excess in cost which the building of the new bridge adapted for street railway use as well as for ordinary travel necessitated over what the cost would have been had only ordinary travel been provided for, and found such excess to be $100,000; and further found that the agreement relating to the old bridge was terminated when the bridge was demolished; that the county was not restricted to charging merely a license fee for the use of the new bridge, based upon the increased cost of maintenance, and could charge the railroad companies a reasonable rental; that a rental of $3,000 annually for the first two years, $4,000 annually for the succeeding two years, and $5,000 annually thereafter for the next six years was reasonable, and decreed that the plaintiff be enjoined from using the bridge except upon compliance with these terms. *Held,* no error.

5. On appeal from a decree in an equity case fixing the compensation to be paid by the railway company for the use of a county bridge, the question before the Supreme Court is whether the decree was based upon proper and competent evidence, and whether it is fair and reasonable under all the circumstances.

6. In such case the admission of irrelevant evidence relating to the compensation paid by street railway companies in other counties for the use of public bridges does not constitute reversible error where it appears that the chancellor gave no consideration whatever to such evidence.

Argued March 3, 1914. Appeal, No. 26, Jan. T., 1914,

by plaintiffs, from decree of C. P. Berks Co., Equity
Docket, 1913, No. 1096, on bill and cross-bill in equity
for an injunction in case of Reading City Passenger Railway Company, Reading Traction Company, United Traction Company, and Reading Transit Company v. County
of Berks. Before FELL, C. J., BROWN, MESTREZAT, POTTER and ELKIN, JJ. Affirmed.

Bill in equity for an injunction; cross-bill for decree
fixing compensation for use of county bridge. Before
ENDLICH, P. J.

From the record it appeared that the bill was filed to
restrain the County of Berks from preventing the appellants from running cars over the Harrisburg bridge, in
the City of Reading, in accordance with an agreement
entered into with the county on December 27, 1893.
This county bridge was demolished and removed, after
having been condemned, in 1910, and a new and larger
county bridge was erected in its place. The county of
Berks filed a cross-bill, praying for a decree fixing and
determining the rental to be paid by the appellants for
the use of the new bridge. In dismissing the appellants'
bill and making the decree asked for in the cross-bill, the
court found facts and reached legal conclusions as follows:

### FINDINGS OF FACT.

1. On December 27, 1893, the Reading City Passenger
Ry. Co. and the Reading Traction Co., to whom it had
leased and whose rights subsequently passed to the
United Traction Co. and thereafter to the Reading
Transit Co., entered into an agreement with the County
of Berks, whereby the latter consented to the construction by the railway companies of a double track railway,
to be operated by electricity, with overhead wires, etc.,
upon and over a county bridge across the Schuylkill
river, known as the Harrisburg bridge (then an iron
structure about 1,000 feet long, forty feet wide, having

a roadway of twenty-six feet, and erected at a cost of $150,000) with stipulations that, upon the bridge, the railway companies' cars should have no preference over other vehicles, and should not be run at a speed of more than four miles an hour, nor more than one car or train of cars at one time—that the county should not be obligated to maintain said bridge for the use of the railway companies or for the purposes of the agreement, and should not be liable for injury to persons or property resulting from the railway companies' use of said bridge—and that the railway companies should pay to the county the annual sum of $600 to be applied to keeping the bridge in repair, the payments to be continued as long as the cars of the railway companies should run across or over said bridge, and a failure so to run them for three consecutive months to be taken as an abandonment of the line and a surrender of the right granted, which was to be exercised within one year or forfeited. The bridge being within the limits of the City of Reading, the consent of the latter to its occupation by the railway companies as indicated was given by resolution of councils approved January 16, 1895.

2. In the meanwhile and before anything was done under the agreement the County of Berks refused to be bound by it, and the railway companies attempting to proceed, applied to this court for an injunction prohibiting them from constructing their tracks upon the bridge. In that proceeding it was found that the bridge was inadequate to support the burden intended to be imposed upon it as well as too narrow to admit of a double track and its operation without undue interference with the general travel and traffic over the bridge, and finally, on August 26, 1895, after requiring the railway companies to strengthen the bridge sufficiently to permit, with safety, the laying and operation of a single track upon it, a decree was made allowing the construction and operation of such single track by the railway companies, on condition of their payment to the county of the annual

sum of $600, so long as the track should remain upon the bridge—that cars should be run thereon at a speed not exceeding four miles an hour and that not more than one car or train of cars should be on the bridge at one time—that the railway companies protect the county against liability from their use of it and against any damage to the bridge therefrom, ordinary wear and tear excepted, and that the county should not be obligated to maintain said bridge for the use of the railway companies or the purposes of the railway—and that failure to run cars for three months should be taken as an abandonment and surrender of the rights granted by the decree, etc.

3. On the western side of the river the Reading & Womelsdorf Electric Ry. Co. constructed its line to and connecting with the track laid upon the bridge in accordance with the decree referred to, and on December 23, 1895, leased the same to the Reading Traction Co., which thereupon transferred it to the United Traction Co., by which it was subsequently passed to the Reading Transit Co.

4. In 1910 the bridge, which in the interval had been used by the railway companies, was condemned as unsafe, and in obedience to notice by the county to the railway companies their traffic over it was stopped, the county agreeing not to treat this as an abandonment of any rights. Pursuant to due and lawful proceedings, and unopposed by the railway companies, the iron bridge was entirely demolished and removed by the county, and a new concrete bridge over 1,300 feet long, eighty feet wide, having a roadway about sixty feet wide, and costing upwards of $575,000, has been erected. The county and the railway companies have agreed to the latter's laying of a double track upon the new bridge, without prejudice, however, to any right of the county to prescribe new terms and conditions to be observed by the railway companies for that privilege and the operation of the railway on the bridge, or, in the event of a failure

to agree thereon, to apply to the court for the imposition of such new terms and conditions upon the railway companies.

5. The county, by way of condition, has demanded an annual payment by the railway companies of $5,000 for a period of ten years, the amount payable thereafter to be readjusted at the expiration thereof. This demand has been declined by the railway companies, and they have filed their bill to enjoin the county from interfering with their laying and operating a double track upon the new bridge, while the county has filed a cross-bill praying for a decree in accordance with its demand and an injunction against the railway companies prohibiting them from using the new bridge for their purposes until the terms and conditions of their occupancy of it be fixed and determined.

6. The population of the City of Reading has increased since 1893 from somewhere about 60,000 to nearly 100,-000 and that of the territory west of the river and directly accessible by the bridge has grown correspondingly, being now thickly populated and containing large industries, many of whose employees reside in Reading. The travel over the bridge is very considerable, and in the natural course of things will become steadily greater —especially in the event of connections with other lines under the Transit Co.'s control so as to bring their traffic and travel into the city over the bridge.

7. The new bridge is amply able to sustain and accommodate the traffic over a double track and the general travel without inconvenience or danger to the public or the bridge.

8. The repairs to the bridge likely to be necessitated by its use by the railway companies will be insignificant.

9. The cost of the construction of the new bridge of a width sufficient to permit a double track upon it, has been about $100,000 greater than it would have been had no railway tracks but the ordinary travel only been provided for—and the cost to the railway companies of a

bridge of their own adequate for their purposes, having a life of thirty to thirty-five years would be from $60,-000 to about that sum, not including changes of route, new tracks, etc., and the price of land to be taken, and thereto would be added the annual expense of maintenance and repairs.

10. Since the discontinuance of the railway companies' use of the old bridge, the county has accepted no payments from them.

CONCLUSIONS.

A. The subject matter of the agreement of 1893 between the county and the railway companies, and of the suit to No. 606 Equity Docket 1894 and the decree of 1895 made therein, was the bridge structure then existing and the use of the same by the railway companies. Necessarily, by the unavoidable demolition and removal of that structure and destruction of its use for any purpose the agreement was terminated and the decree exhausted, and all rights and liabilities created by either ended; and the right of the railway companies to occupy the present bridge structure became dependent upon new arrangements as to terms and conditions if the county desire to impose such.

B. The county is entitled to exact from the railway companies as a condition precedent to their right to use the new bridge structure, a reasonable compensation for such right and use, the amount and manner of payment of which, upon and by reason of the failure of the parties to agree thereon, are to be fixed by the court in this proceeding.

C. A requirement that the railway companies pay to the county in quarterly instalments the sum of $3,000 for and during each of the first two years, $4,000 for and during each of the next two years, and $5,000 for and during each of the succeeding six years, the regulation of the amount, etc., of payment to be made after the expiration of the said period of ten years to be left

to further agreement of the parties or decree of the court thereafter, is reasonable and fair under the circumstances of the case as stated in the Findings of Fact.

D. The prayer of the bill filed by the railway companies is to be refused, and upon the county's cross-bill a decree is to be entered enjoining the railway companies as prayed for therein except upon compliance with the terms and conditions indicated in the next preceding conclusion, to be secured by the filing of a bond by the railway companies in $10,000.

E. The costs of this suit are to be paid by the railway companies.

The court on final hearing refused the relief prayed for in the plaintiffs' bill, and entered a decree upon the cross-bill in favor of the defendant. Plaintiffs appealed.

The following exceptions, among others, were filed and dismissed:

"1. The court erred in admitting the following evidence:

" 'D. K. Hoch, sworn:

" 'Q. Will you tell us what the contract price for the erection of the new bridge is?

" 'Mr. Heister: Objected to as irrelevant.

" 'Mr. Dickinson: This for the purpose of giving the court all necessary data.

" 'The Court: Admitted; exception for plaintiffs.

" 'A. $325,910.

" 'Q. Is that the entire cost of construction? A. No, sir, that is the contract price.

" 'Q. Will there be any additional cost? A. Yes, sir.

" 'Q. What will that be? A. There are extras of $14,-175.46; cement so far has cost us $20,955.07; damages to properties $166,405; and other expenditures $48,-225.87.' "

Order of court: "The exceptions are dismissed." (1)

"2. The court erred in admitting the following evidence:

" 'Charles F. Sanders sworn:

" 'Q. Are you able to give the approximate cost of an iron bridge, exclusive of land damages, of course, erected at or about the same place sufficiently strong and large to permit the operation of a double track street railway thereon and to be used only for railway purposes? A. Yes, sir.

" 'Mr. Hiester: Objected to as immaterial.

" 'Mr. Dickinson: This for the purpose of giving the court all the necessary data on which they can come to a conclusion as to what should be a proper compensation for the use of the bridge. The purpose here is to show what it would cost the Traction Co. to erect a bridge if they were erecting one for their own exclusive use.

" 'The Court: Admitted; exception for plaintiffs.

" 'By Mr. Dickinson: Q. What in your opinion would be the approximate cost of such a bridge? A. I have made up an estimate on two different types—

" 'By the Court: Q. What in your opinion would it be? A. A truss bridge would cost $60,560.

" 'By Mr. Dickinson: Q. That is a truss bridge? A. Yes, sir.

" 'Q. What other kind of bridge? A. Through deck girder bridge would cost $94,880.

" 'Q. Either of such bridges though would be sufficient for the accommodation of a double track railway? A. Yes, sir.

" 'And that would be an iron bridge? A. Yes, sir.

" 'Q. What would the life of a bridge of such character be? A. The ordinary life of an electric railway bridge is about 30 to 35 years.' "

Order of court: "The exceptions are dismissed." (2)

"3. The court erred in admitting the following evidence:

" 'Charles F. Sanders sworn:

" 'Q. What would be the ratio of cost of structures having a width of 56 feet and one of 80 feet, other dimensions and construction being the same?

" 'Mr. Hiester: We object to this.

" 'A. 72½ to 100.

" 'Q. What in your opinion would be the cost of a structure having a width of 56 feet, of the same construction as the present bridge, which you have already said would be sufficient for ordinary travel, not including highway travel? A. $257,515.

" 'Q. Would a concrete bridge of the type of the new structure, of the width of the old bridge, be sufficiently wide to accommodate the operation of a double track railway thereon without interfering with ordinary travel? A. No. sir.

" 'Q. How much wider is the driveway of the new structure than the driveway of the old bridge? A. 30 feet.

" 'Q. What proportion of the whole cost of the new structure do you consider was rendered necessary by the fact that it was designed to accommodate a double track railway? A. 27½ per cent.

" 'Q. What, in dollars, in your opinion does the new bridge cost more than a bridge of the same type of construction designed to accommodate only the ordinary travel? A. $97,795.' "

Order of court: "The exceptions are dismissed." (3)

*Errors assigned,* among others, were (1, 3) in dismissing exceptions to rulings on evidence as to various findings and conclusions of the trial judge, and the decree of the court.

*Isaac Hiester,* with him *C. H. Ruhl* and *R. L. Jones,* for appellants, cited: Point Bridge Co. v. Pittsburgh Railway Co., 240 Pa. 105; Berks Co. v. Reading City Pass R. Co., 167 Pa. 102, 116, 118 (31 Atl. Repr. 474, 663); Reading v. United Traction Co., 202 Pa. 571, 576; Western Union Tel. Co. v. Penn. Co., 129 Fed. 849; Great Northern Ry. Co. v. Manchester, Etc., Co., 5 DeGex & Sm. 138; Llanelly, Etc., Co., v. London. Etc., Co.

L. R. 7 H. L. 550; Franklin Tel. Co. y. Harrison, 145 U. S. 459, 471; (12 So. Repr. 900).

*Joseph R. Dickinson,* for appellee, cited: Berks Co. .v. Reading City Pass. R. Co., 167 Pa. 102; Larue v. Oil City Ry. Co., 170 Pa. 249 (32 Atl. Repr. 977); Lawrence County v. Newcastle Electric St. Rwy. Co., 8 Pa. Superior Ct. 313; Beaver County v. Beaver Valley Traction Co., 229 Pa. 565; Monongahela Bridge Co. v. Pittsburgh Railways Co., 240 Pa. 121; Lovering v. Buck Mountain Coal Co., 54 Pa. 291; Ward v. Vance, 93 Pa. 499.

OPINION BY MR. JUSTICE BROWN, July 1, 1914:

With the demolition and removal of the old Harrisburg bridge, in the City of Reading, there was a termination of the agreement of December 27, 1893, between the County of Berks and the Reading City Passenger Railway Company and the Reading Traction Company. When that bridge passed away the agreement of 1893 passed away with it. The learned chancellor below was so manifestly correct as to this that we are not called upon to say anything further upon the subject. When the new and much larger county bridge was erected the appellants had no right to occupy it without the consent of the county; but that consent could not have been arbitrarily withheld from them: Berks County v. Reading City Passenger Railway Company, et al., 167 Pa. 102. The terms upon which they had the right to use it became a matter of agreement, in the first instance, between them and the county, and when they were unable to agree, the equitable jurisdiction of the court below was properly invoked by the county in its cross-bill, for the purpose of determining the terms and conditions upon which the appellants might use it: Pittsburgh & West End Passenger Railway Company v. Point Bridge Company, 165 Pa., 37; Berks County v. Reading City Pas-

senger Railway Company, et al., supra; Larue, et al., v. Oil City Passenger Railway Company, et al., 170 Pa. 249.

The appellants resist payment of any demand in excess of $600 per year for the use of the bridge—the amount fixed by the agreement of 1893—as "illegal, exorbitant and unjustifiable." In support of this contention they rely upon what we said in Point Bridge Company v. Pittsburgh Railways Company, 240 Pa. 105; and Monongahela Bridge Co. v. Pittsburgh Railways Company, Id., 121, limiting the claim of a city owning certain bridges to a sum equal to the additional cost for the supervision and repair of the same, made necessary by the use of them by the street railway companies. The answer to this is found in the following from the opinion of the court below: "In each of the cases cited a railway company had acquired the right to use with its tracks and cars a toll bridge owned by a corporation upon payment to it of a certain rental, and the city had consented to its occupation of the bridge as part of the highways without imposing any conditions. Subsequently the city had acquired the stock of the bridge company, thereby becoming the owner of the bridge, and declaring it free, reserving no payments from the railway company. It was held that the city could not thereafter exact any rental from the railway company, but was restricted to demanding from it such a license fee as would reasonably cover the cost and expense of repairs, maintenance and supervision required by the extraordinary use to which the structure was subjected—a right vested in it by reason and in the exercise of its police power. The language of the decisions, however, carefully confines them to the case of a right already acquired and lawfully used, as contradistinguished from one to be newly acquired upon terms and conditions imposed by the municipality, and to be used in accordance with them. The power in the latter case to exact something more is nowhere negatived, but explicitly recognized, as in the earlier cases; the intention to disturb which is disavowed, and under

which, where they apply, the authority to demand and the obligation to pay are not referable to the police power. As already pointed out, it is with a question of the initial grant of a new right upon original conditions that we have here to do, not with one of a demand based upon the continued use of a right previously granted and accepted on other, or without, conditions. In passing upon the question here arising the inquiry is whether the county in its demand is exceeding what is fair and reasonable under all the circumstances, so as to make it in effect an attempt arbitrarily to defeat the railway companies' use of the bridge: see Berks Co. v. Rdg., Etc., Cos., 167 Pa. 102, 115, 118." On this appeal the real question is whether the compensation fixed by the decree of the court below for the use of the county bridge by the appellants was based upon proper and competent evidence and is fair and reasonable under all the circumstances.

Under the evidence which was considered by the learned chancellor below we find no error in any fact found by him, and the eleventh, twelfth, thirteenth, fourteenth and fifteenth assignments are dismissed. The ninth finding is as follows: "The cost of the construction of the new bridge of a width sufficient to permit a double track upon it, has been about $100,000 greater than it would have been had no railway tracks but the ordinary travel only been provided for—and the cost to the railway companies of a bridge of their own adequate for their purposes, having a life of 30 to 35 years would be from $60,000 to about that sum, not including changes of route, new tracks, etc., and the price of land to be taken, and thereto would be added the annual expense of maintenance and repairs." This fact was pertinently found, and the evidence in support of it, which is complained of by the first, second and third assignments, was properly received as helpful to the court in determining what would be proper compensation for the use of the bridge by the appellants, so constructed by the coun-

ty as to accommodate their growing needs.  The first second and third assignments are overruled.

The fourth, fifth, sixth and seventh assignments complain of the admission of evidence as to the compensation paid by the street railway or traction companies in other counties for the use of public bridges.  This was not proper testimony for the consideration of the court.  The question before it was as to the compensation to be paid for the use of a particular bridge, under all the circumstances surrounding its construction.  What might be proper compensation for the use by a trolley company of an entirely different kind of bridge, situated elsewhere, could throw no possible light upon the question of the proper compensation to be paid for the use of the Harrisburg bridge in the City of Reading.  But this evidence did the appellants no harm, for the learned chancellor distinctly says, in overruling the exceptions to his findings of fact and conclusions of law, that he gave no consideration whatever to it.  Its mere admission does not, therefore, call for a reversal of the decree.  In this respect the proceeding below differs from a common law action: Sawtelle's Appeal, 84 Pa. 306.

The eighth, ninth and tenth assignments do not seem to be pressed, and there is no merit in them, for the appellants were in no manner prejudiced by the information submitted to the court as to the number of passengers which they carried in their cars daily over the bridge, or as to the extent of the general travel over it.

There is nothing in the remaining assignments of error calling for further discussion.  The legal conclusions reached by the court below properly followed the facts found, and the decree is affirmed at appellants' costs.