# Point Bridge Company *v.* Pittsburgh Railways Company, Appellant.

*Municipalities — Street railways — Bridges — Use of bridge—Municipal consent—Rental—License tax.*

1. Where a street railway is rightfully upon a bridge controlled by a municipality by and with the consent of the municipality pursuant to an ordinance and no rent has been made a condition of the consent, the municipality cannot thereafter exact rental. All that it can do in such case is to require of the railway company a license fee in amount reasonably sufficient to indemnify it for whatever cost and expense by way of repair, maintenance and supervision of the bridge it is called on to bear by reason of the extraordinary use to which the structure is subjected.

2. Where a municipality has acquired all the stock of a bridge company on which an electric railway company operated its railway paying rental to the bridge company, and the municipality frees the bridge and without any conditions or rental, the municipality cannot thereafter, in a suit brought in the name of the bridge company, collect a rental from the railway company for the use and occupation of the bridge. In such a case the consent having been once given by the city, and accepted by the street railway company, a contract exists between the city and the company which is under the protection of the Federal Constitution and new conditions cannot thereafter be imposed by the city for the use of the bridge.

3. In the trial of such action it is error for the case to be submitted to the jury on the theory that a rental could be recovered, and for the court to admit evidence tending to show the amount of rental which would be reasonable. All that the city may show is the additional cost for supervision and repair of the bridge, resulting from the extraordinary use made of it by the railway company.

MR. JUSTICE MOSCHZISKER dissents.

Argued Nov. 6, 1912. Appeal, No. 71, Oct. T., 1912, by defendant, from judgment of C. P. Allegheny Co., May T., 1909, No. 142, on verdict for plaintiff in case of the Point Bridge Company v. Pittsburgh Railways Company. Before FELL, C. J., MESTREZAT, ELKIN, STEWART and MOSCHZISKER, JJ. Reversed.

Assumpsit for the use and occupation of a bridge.
Before KENNEDY, P. J.

At the trial the court permitted the plaintiff under objection and exception to prove the number of fares received by the defendant from cars that crossed over the Point Bridge from 1902 to 1908, inclusive. (1)

The court admitted under objection and exception proof as to how much was necessary to be set aside as a sinking fund in order to reconstruct the necessary parts of the bridge after the expiration of twenty years. (2)

The court admitted under objection and exception proof that money invested in a similar bridge was entitled to receive under commercial practice a certain annual percentage or return. (3)

The court admitted under objection and exception proof as to what was a fair and reasonable toll by railway companies for the use of similar bridges. (5, 10)

Plaintiff presented the following points:

"2. You are to allow to the plaintiff a fair and reasonable compensation for the use which the defendant makes of the plaintiff's bridge and approaches, by way of a rental, and in ascertaining this, you will not consider the question of whether a charge is made for general public travel. That is to say, you are to determine what is fair and reasonable, for the use of said bridge and approaches by the defendant, which will not be increased nor decreased, by reason of the fact that no charge is made by the bridge company to the general public.

"Answer: Affirmed. (13)

"4. In considering what is furnished for the use of the defendant by the plaintiff, you will consider the location and character of the bridge, its length, its height, the space on the bridge and approaches, which is used by the defendant, the value of the bridge during the years in question, the cost of maintaining and the amount spent for repairs and reconstruction of said

bridge, the probable life of the bridge with the use to which it is subjected especially by the defendant company, and in this connection you will consider the question of the amount of the annual sinking fund necessary to be set aside to replace this bridge at the end of its life.

"Answer: Affirmed. (14)

"5. In considering the use made of this bridge by the defendant company, you will consider the placing of its poles, wires and tracks upon this bridge, the number of tracks across said bridge and approaches, the size, weight and number of cars operated across this bridge, and the number of persons carried in said cars. You will also consider the territory which is served by the defendant's cars operated across this bridge, and all the circumstances surrounding the use made of this bridge, in so far as it is of value and a source of revenue and profit to the defendant company.

"Answer: Affirmed. (15)

"7. In considering what is a fair and reasonable compensation for the use of this bridge and approaches by the defendant company, you will consider the rates paid for a similar use on other bridges in the City of Pittsburgh, and in Allegheny County. These rates are not controlling or binding upon you in any way, but are simply for the purpose of considering and determining what is fair and reasonable, and in considering any of these cases, you will take into account all of the circumstances surrounding and affecting the bridge and the use that is made of it.

"Answer: Affirmed." (16)

Defendant presented these points:

"1. As it appears from the uncontradicted evidence in this case that in April, 1896, all the stock of the bridge company was acquired by the City of Pittsburgh, and upon June 1, 1896, the city took possession of the bridge, and since that time no tolls have been charged to foot passengers or vehicles, other than street cars, and that

since that time the charge, maintenance and control of the bridge structure has been in the city, the cost of repairs having been borne by the city, and there can be no recovery as against the defendant.

"Answer: Refused. (17)

"2. As it is shown by the evidence that by an ordinance to the Pittsburgh and West End Passenger Railway Company, its successors, lessees and assigns, the right to use this bridge was granted by the city, and the Pittsburgh Railways Company has succeeded to all the rights under that ordinance; and as this bridge is a part of the highways of the City of Pittsburgh, there can be no recovery against the defendant.

"Answer: Refused. (18)

"3. The jury has no right to take into consideration the amount paid to the bridge company by the street car company before it was taken over by the city and made free, nor can the jury consider the question of any profit upon the stock of this bridge company held by the city.

"Answer: Refused." (19)

Verdict and judgment for plaintiff for $72,246.81. Defendant appealed.

*Errors assigned* were (1-12) rulings on evidence quoting the bill of exceptions; (13-19) above instructions quoting them.

*Edwin W. Smith,* of *Reed, Smith, Shaw & Beal,* for appellant.—This court decided the right of the City of Pittsburgh to hold all of the stock and maintain the corporate existence of a bridge company in Com. v. Monongahela Bridge Company, 216 Pa. 108. It decided the validity of the claim of the Monongahela Bridge Company to collect tolls after the purchase of its stock by the city under the contract with the Traction Company in Monongahela Bridge Company v. Pittsburgh & Birmingham Traction Company, 196 Pa. 25. It decided

that a court of equity has no right to enforce the claim of a bridge company for back tolls in Pittsburgh & West End Railway Company v. Point Bridge Co., 223 Pa. 133. It decided that the bridge company had the right to recover for the use of the Point Bridge by the railway company under the decree of November 12, 1892, up to the end of the period fixed by the decree November 12, 1897, in Point Bridge Company v. Pittsburgh & West End Railway Company, 230 Pa. 289. It determined how a rate was to be fixed for the use by a railway company of a public bridge in Beaver County v. Beaver Valley Traction Company, 229 Pa. 565.

The bridge company has no right to maintain this action.

The court's admission of evidence and its rulings do not establish the right measure of damages: Beaver County v. Traction Company, 229 Pa. 565.

*C. K. Robinson,* with him *C. A. O'Brien* and *C. Elmer Bown,* for appellee, cited: Com. v. Sunderlin, 31 Pa. Superior Ct. 349; Pittsburgh & West End Ry. Co. v. Point Bridge Co., 223 Pa. 133.

OPINION BY MR. JUSTICE STEWART, March 31, 1913:

The bridge which is the subject of this controversy is an essential part of a public street or highway in the City of Pittsburgh. It was none the less so before 1896 when it was the property of a private corporation. "A bridge erected for public travel and accommodation is a public highway whether built and maintained by the inhabitants of the district, or by a corporation authorized to demand toll for passage over it": Pitts. & West End Pass. Ry. Co. v. Bridge Co., 165 Pa. 37. In June, 1896, the City of Pittsburgh, with a view to relieving its inhabitants from the burden of tolls for the use of the bridge, purchased the entire capital stock of the bridge company. While the effect of this purchase was not to vest the ownership of the bridge in the city, as we said

in Monongahela Bridge Co. v. Traction Co., 196 Pa. 25, since the bridge company as a corporate entity was not by the purchase extinguished, nevertheless by the purchase the power of absolute control passed to the city, the only stockholder, as trustee for its inhabitants, as completely as though it had been the purchase of the physical structure of the bridge. Exercising this right of control, resulting from the acquisition of the capital stock, the city at once, June 26, 1896, declared the bridge free to public use. The action while brought in the name of the bridge company, is to enforce a demand of the city, and the latter is the real plaintiff. At the time the city acquired control the bridge was subjected to the use of appellant's tracks in the same way and to the same extent as was any other part of the highway or street traversed, and this had been the situation for years before. The company, to whose rights the appellant has succeeded, in constructing its road upon the public streets, had exercised its chartered rights in so doing by and with the consent of the city authorities. To all these rights and privileges the defendant company has succeeded, and it is as rightfully upon the bridge with its tracks, so far as that right depends on the city's consent, as upon any other part of its chartered route, and whatever conditions the city exacted for the consent given for the use of the streets applies as well to the use of the bridge. If there were any conditions applying specially to the use of the bridge, these became part of the contract as well between the city and the company, and except as changed by mutual agreement remain unaffected. But the right to exact conditions from the company, for the continued use of bridge or street by way of return for whatever benefit or advantage the company received, ended with the consent then given; the contract between the city and the company was then concluded, and the rights of the respective parties established. "The municipality acts by virtue of delegated authority from the

legislature, and as the representative or agent of the State for that purpose. Hence, the ordinance of a city made pursuant to legislative authority, granting the right to use the streets of the city for a railroad...... or for any other publicly recognized service, is, when accepted and acted upon by the grantee, a contract within the protection of the Federal Constitution, and new conditions cannot, in the absence of a reserve power, be imposed on the exercise of the right granted." Dillon on Municipal Corporations, Section 1242. It is in the power of the municipality to exact whatever terms it choses as a condition of its consent. "It simply says (to the applying company) I have the sole and exclusive power to consent or refuse; on certain conditions I consent, otherwise I refuse. I don't compel you to do anything, I merely give you a choice between alternatives; you have no power or right to demand my consent; you ask it, and I give it on my own terms, or not at all." MITCHELL, J., in Allegheny City v. Railway Co., 159 Pa. 411. Once given and accepted and acted upon by the other party, the bargain is concluded, and nothing in the nature of a condition other than what is expressed in the ordinance of consent can be required. There was still left however, in the city the right of regulation and control in the exercise of a police power of which it could not divest itself. Our inquiry here must be whether the city's demand in the present case can be sustained as a proper exercise of such power. Except as it may be, it has nothing to rest upon. The city is conferring nothing upon appellant which the latter could not rightfully claim as incidental to and necessarily implied in the consent originally given it to occupy the bridge. True, the city has since given it over as a free bridge, but this it gave in like manner to every inhabitant, and having given it to the public at large, it could no more deny it, under reasonable regulations, to a corporation chartered to do business within the city limits, than it could deny its use to a particular indi-

vidual under like conditions: Frankford & Philadelphia Pass. Ry. Co. v. Philadelphia, 58 Pa. 119. The situation then being the same as when the city rightfully gave its consent to the occupancy of the bridge, its present demand may not be asserted as an additional condition to those which it imposed at the outset, and can be maintained only as it can be brought within the police power of regulation. We turn to the statement of claim filed to ascertain just what the demand is. It is there thus stated: "The Point Bridge Company claims compensation from the Pittsburgh Railways Company for the use of said bridge by it and its predecessors in title, from the twelfth day of February, 1897, until the twelfth day of February, 1909, no compensation having been paid to it during said period, although demand has often been made for the same. The Point Bridge Company has fixed the rate of compensation which it is entitled to receive from the defendant for the use of its structure between said dates as follows:......The total claim of the plaintiff is, therefore, the sum of $40,000 from November 12th, 1897, to November 12th, 1902, with interest on monthly instalments of $666.66 falling due at the expiration of each month during said period. Also the sum of $50,000 for the period from November 12th, 1902, until November 12th, 1907, less the charge from May 28th, 1904, until December 7th, 1904, being six and one-third months, with interest upon the monthly instalments during said period of $833.33, also the sum of $15,000 from the twelfth day of February, 1909, with interest upon quarterly instalments of $3,000 from the expiration of each quarter during said period." Then follows the averments, (1) that the use by defendant and its predecessors in title, whose obligations it assumed, has continually increased from the time the bridge was first entered upon, so that for some years cars to the number of 1,200, single trips, and upwards have been operated daily on the bridge, the said number having steadily increased from year to year, the size and

weight of the cars having steadily increased from time to time, and the number of passengers carried thereon being steadily augmented; (2) that said bridge is an expensive structure, having cost in its original construction over $500,000 and large sums of money have been expended upon it for reconstruction and repair, and by reason of the increasing traffic over the bridge, particularly that occasioned by the operation of the cars of the defendant company, the life of the same will be shortened and entirely new structure will be required before many years; (3) that the bridge because of its height has required large and expensive approaches; (4) that the franchises of the bridge are very valuable on account of its strategic location: "Wherefore," concludes the statement, "the sums herein charged for the use of said bridge by the defendant company and its predecessors are fair and reasonable charges," and demand is accordingly made.

It will be observed that there is no suggestion in the statement of any express contract on part of the defendant company to pay anything. Stating it most favorably to the plaintiff, the action rested on an implied assumption on the part of the defendant to pay to the city what the city could under its police power by ordinance have required it to pay. It is manifest that under this power it could not have exacted rent for use and occupation. For convenience in speech, but at the expense of accuracy, what is properly exacted under general police power from companies of this character when they use municipal structures in some of our own and other cases is characterized as rent; but the term when so employed ought not to mislead. It is correct enough when applied to the privilege of using a municipal bridge by telegraph and telephone companies, for, as said in St. Louis v. Western Union Tel. Co., 148 U. S. 92, where the sum exacted was held to be rent: "It is in the nature of a charge for the use of property belonging to the city, ......that which may be properly called rental. The

use made by the company is in respect to so much of its space as is occupied by its telegraph poles, permanent and exclusive.......Whatever benefit the public may receive in the way of transportation of messages, that space is, so far as respects its actual use for the purpose of highway and personal travel, wholly lost to the public. To that extent it is a use different in kind and extent to that enjoyed by the general public." Street car companies stand upon very different footing; their business is solely and exclusively that of transportation in travel, and for this purpose the service of a car company over a bridge such as this is absolutely indispensable to the public; the company's occupancy of the bridge is in no sense exclusive but is shared in with the general public, for the bridge and the whole of it is open to public travel of all sorts. Making all allowance for the space occupied by its poles which are mere instrumentalities in aid of public travel—in this respect differing from telegraph poles—by enabling the railway to operate, they largely increase the accommodation of the bridge for the only purpose it was intended to serve. The city would have no more right to exact rental from this company for the use of the bridge than for any other part of its highways except as it had been made a condition of the grant of the franchise.

Since a contract arising out of conditions of the grant can alone give to the municipality the power to exact rent from a street car company, what may it exact in the absence of such contract? We have not far to seek for the answer. Our own decisions show clearly what may and what may not be done in such case. The municipality may not prohibit the railway company from exercising and enjoying the franchise with which it has been invested: Frankford & Philadelphia Pass. Ry. Co. v. Philadelphia, supra; it may not tax its business for the purpose of raising revenue, since that would be an invasion of its corporate franchise derived by grant from the Commonwealth, and therefore unlawful and void:

Johnson v. Philadelphia, 60 Pa. 445. On the other hand
it may in the exercise of its police power regulate the
use of the company's franchise, and to this end it may
exact from the company a license fee: Frankford &
Philadelphia Pass. Ry. Co. v. Philadelphia, supra. Such
license fee, however, can have no other purpose than to
enable the municipality, without cost to itself, to meet
and supply conditions created solely by the railway
company, but for which the municipality is legally re-
sponsible. The use to which the railway company sub-
jects the bridge over which it passes is distinguishable
in several particulars from that which it is subjected to
by ordinary travel. Quite manifestly it imposes on the
municipality special burdens against which the munici-
pality has a right to be relieved. For the proper mainte-
nance of the bridge so as to secure safety the munici-
pality is responsible. The extraordinary use made of its
tracks by the railway company, in the continued and con-
stant transportation of cars, unusual in weight in com-
parison with the ordinary vehicles in use, must in the
nature of things entail upon the municipality additional
cost for supervision and repair. A license fee suffi-
ciently indemnifying the municipality against such ad-
ditional cost may very properly be exacted because of
the special use which has occasioned the necessity. It
may be, and it is the contention of the appellee, that the
special use made of the bridge by the railway company
will materially shorten the life of the structure. We do
not know how this is, but if it be a fact, no reason can be
advanced why that circumstance should not be consid-
ered as a proper subject of indemnity. So too with re-
spect to everything resulting in increased cost to the
city which has been occasioned because of the extraor-
dinary use made by the railway company of the bridge.
"Mere charges (the reference being to license fees
charged to telegraph companies) by municipalities under
delegated authority may be imposed upon public service
corporations occupying the streets of a city, but not by

way of rental, but in the exercise of the police power and to enable the municipality without cost to itself to discharge the duty it owes to the public." Dillon on Municipal Corporations, Section 1274. We have repeated decisions of our own in which the doctrine here asserted has been applied to telegraph companies which have entered upon the streets under franchise of the State and with the consent of the municipality. These cases, or many of them, are cited in the opinion in the recent case of Del. & Atl. Tel. & Tel. Co.'s Petition, 224 Pa. 55, where the same rule is recognized. The like principle must be applied to railway companies under similar conditions. In the case of telegraph companies the license fee is sustained on the ground that the municipality has a right to so save itself from the cost of inspection and supervision made necessary for public safety in consequence of the erection of poles, etc. This rule must govern equally with respect to railways, and whatever burden outside of that, resulting from extraordinary use of the bridge, in the way of maintenance of the structure, may properly be considered as an element entering into the determination of the amount of a license fee to be charged.

What we have said in discussing the general subject under consideration may at first glance seem to conflict with what we have said in several of our cases, but any question as to this will be removed upon a careful study of these cases. The two cases supposed to be most at variance are Beaver County v. Telegraph Company, 219 Pa. 340, and Beaver County v. Traction Co., 229 Pa. 565. It is only necessary to say with respect to these cases that both distinctly recognize as proper elements to be considered in determining the compensation, or whatever it may be called, which the municipality may claim from the railway, under conditions such as we have here, those matters to which we have specially referred, and such other matters as occasion expenditure by the municipality in consequence of the extraordinary use of the

bridge by the railway company. If in either the final recovery embraced more than these matters, it was because no assignment of error directed the attention of this court to such excess. In Point Bridge Co. v. P. & W. E. Ry. Co., 230 Pa. 289, the action was upon an express agreement made by the railway company with the bridge company for the use of the bridge for a period of five years at a yearly compensation to be fixed as to amount by the court. Before the expiration of the term the contract for the use of the bridge had passed from the bridge company to the city, and upon the refusal of the company to pay the compensation for the period of the term unexpired when the city purchased, the city brought its action. We held that the action was a proper and adequate remedy for the recovery of any sum that might be due for the use of the bridge for the five year period, only however because the claim rested in a contract to which the city had succeeded. That case decides nothing that is involved in this. In Beaver County v. Telegraph Co., supra, the action was against a telegraph company for the use of a bridge for other purposes than those of public travel. If the line of distinction be observed between telephone and telegraph companies and street railways as to their respective rights, and the further distinction where the action has rested on contract and where it was for penalty and license fee, no substantial conflict will be found to exist.

Considering then the limitations upon the police power of the municipality as we have above indicated in connection with license fees—and, as we have seen, it can exact nothing beyond from the railway—it is apparent that the inquiry in the present case was allowed to embrace much that should have been excluded. Evidence was admitted under objection with respect to the number of fares received by the defendant company from 1902 to 1908 inclusive; likewise, evidence of the gross receipts of defendant for the same period. A license fee based on such considerations would be taxation

pure and simple. The same objection would apply to the evidence admitted to show a commercial practice entitling the owners of a bridge to receive a certain annual return upon the money invested, and to the evidence of what other railway companies would require to pay for privileges, on other bridges like those enjoyed by the defendant on this. In the first twelve specifications of error the admission of such evidence as we have referred to is complained against, and these assignments are sustained. The thirteenth, fourteenth, fifteenth and sixteenth may be considered together. They alike relate to instructions given by the trial judge in answer to points submitted by counsel for appellee. These instructions all proceed on the theory that it was an action for rent that was being tried. The points were affirmed and in consequence the jury were instructed, according to the thirteenth, that they were to "allow the plaintiff a fair and reasonable compensation for the use the defendant makes of the plaintiff's bridge and approaches, by way of a rental,......not to be increased or decreased by reason of the fact that no charge is made by the bridge company to the general public." In view of what we have said in the general discussion, this was manifest error. The point involved in the fourteenth instructed the jury to consider "the location and character of the bridge, its length, its height, the space of the bridge and approaches, which is used by the defendant, the value of the bridge during the years in question, the cost of maintaining and the amount spent for repairs and reconstruction of said bridge, the probable life of the bridge with the use to which it is subjected especially by the defendant company, and in this connection you will consider the question of the amount of the annual sinking fund necessary to be set aside to replace this bridge at the end of its life." Many of the specific matters here included were proper for consideration in view of the issue, but only however as they were of help in determining what additional cost by way of repair

and maintenance resulted from the extraordinary use to which the bridge was put by the defendant company. If there was evidence in the case showing that in consequence of such extraordinary use the life of the bridge would be shortened, such evidence called for consideration, but certainly not as forming a basis for a charge against the defendant company sufficient to replace the bridge at the end of its life. To whatever extent such extraordinary use of the bridge contributed in shortening its life, for such contribution the company might well be charged; but to charge it with the whole cost of a new structure would be beyond all reason. By the point involved in the fifteenth the jury was instructed to consider "the territory which is served by the defendant's cars operated across this bridge, and all the circumstances surrounding the use made of this bridge, in so far as it is of value and a source of revenue and profit to the defendant company." With the profits of the defendant company the jury had nothing whatever to do; nor was it a matter of concern to the city; all the city could require was indemnity against the extraordinary expense it was put to by the company's occupancy of the bridge, and its right to require this depended in no degree upon the financial success of the defendant company. The instruction complained of in the sixteenth assignment was, that, "In considering what is a fair and reasonable compensation for the use of this bridge and approaches by the defendant company, you will consider the rates paid for a similar use on other bridges in the City of Pittsburgh, and in Allegheny County." The evidence the jury was here directed to consider was wholly incompetent and should have been excluded. The several assignments above commented upon are sustained.

The seventeenth, eighteenth and nineteenth assignments complain of the refusal of the court to instruct as requested by defendant's counsel in certain points submitted. The first two points were to the effect that

there could be no recovery in the action inasmuch as the city having in 1896 acquired all the stock of the bridge company and thrown the bridge open to free public travel, itself bearing all the cost of repairs and maintenance; the second, that there could be no recovery because the bridge is part of the highway of the city, and the defendant company is rightfully thereon by reason of the ordinance granting the consent of the city. The action here is not based on any ordinance of the city. Whether in the absence of an ordinance establishing a license fee the city may recover from the defendant what it has paid for repair and maintenance of the bridge during all these years, and which it might have protected itself against by an ordinance requiring a license fee, is not before us, nor has it received discussion at the hands of court or counsel. The language of the first of the above points merely suggests it. As the record stands we are not called upon to consider it, or the further question as to the effect of the repeated demands upon the defendant company in this connection alleged in the plaintiff's statement. Aside from these questions which at present are not involved, there was no error in refusing the instructions. The nineteenth assignment is the converse of one of the plaintiff's points which we have already passed on, and is sustained. The twentieth calls for no consideration in view of the disposition we are about to make of the case.

The judgment is reversed and a venire facias de novo awarded.

MOSCHZISKER, J., writes dissenting opinion.

DISSENTING OPINION BY MR. JUSTICE MOSCHZISKER:

Before the taking over of the stock of the bridge company by the City of Pittsburgh, the defendant railway and its predecessors had always paid a considerable rental for the use of the bridge,— more, I believe, than the amount assessed in the verdict in this case. Under Beaver County v. Beaver Valley Traction Co., 229 Pa.

565, the City of Pittsburgh, through the plaintiff company, is still entitled to the rental. The majority opinion will in effect deprive the municipality of that income, and this upon a theory which rejects and repudiates the whole doctrine of the case just cited. The Beaver County case was heard by the entire present membership of this court; it was decided after mature deliberation, and the opinion was unanimously adopted; the underlying principles expressed therein and essential to the decision in that case, rule the present one, and I cannot concur in a departure therefrom. For this reason I dissent.

*Municipalities—Street railways—Bridges—Use of bridge—Municipal consent—Rental—Set off.*