American Baseball Club of Philadelphia et al. *v.* Philadelphia, Moore, Mayor et al., Appellants.

312

Argued April 10, 1933.   Before Frazer, C. J., Simpson, Kephart, Schaffer, Maxey, Linn, and Drew, JJ.

313

*James Hall Prothero,* with him *Thomas B. K. Ringe, Ernest Lowengrund,* Assistant City Solicitors, and *David J. Smyth,* City Solicitor, for appellant.

*Robert F. Irwin, Jr.,* of *Donahue, Irwin, Merritt & Gest,* with him *George M. Kevlin* and *Charles G. Gartling,* for appellees.

OPINION BY MR. JUSTICE KEPHART, June 30, 1933:

Appellee, the owner of Shibe Park in Philadelphia, a stadium accommodating 30,000 persons, had scheduled some 77 baseball games for the season of 1932. An ordinance of the city enacted December 15, 1931, required those giving athletic contests or exhibitions at which an admission was charged to pay a license fee based upon a reasonable estimate of the number of policemen or firemen which, in the opinion of the director of public safety, would be necessary to protect the public safety at and on the premises at such contests or exhibitions, at the rate per man of $5.50 per day. Appellee and the Philadelphia National League Club were notified by the director of public safety that neither would be permitted to play its first scheduled game unless it applied for a license, and paid as the license fee for that particular

game $66.00, and thereafter it would be required to pay a license fee for each of its scheduled games or exhibitions for the year 1932. The applications for licenses and payment of the fees were made under protest. Appellee and the Philadelphia National League Club filed a bill in equity against the city, its mayor, director of public safety and superintendent of police, to have the ordinance declared invalid and to restrain its enforcement. The court below decreed the ordinance invalid, restrained its enforcement, and directed the repayment of the fees already paid. The city appeals from this decree.

At the outset it must be noted that the ordinance deals with private enterprises engaged in a continuous seasonal business for profit, which make extraordinary use of municipal facilities in order to conduct their private business successfully. The profitable operation of these businesses involves the attraction of a large number of persons to a central place. They require a large number of police officers for the maintenance of public order, especially at the ticket windows and entrances, the speedy conduct of traffic on the highway, and the protection of appellees' property and business in supervising the attendance by preventing from attending those who fail to pay an admission fee. Without the presence of this unusual number of policemen, the proper ordering, protection and safety of the public would be impossible, where, as is usual at public athletic contests, large groups of persons gather together.

It has been recognized consistently by judicial authority that where it is necessary in the proper conduct of business that unusual demands be made on the city facilities, a reasonable charge may be made by the municipality to cover its actual expense in providing such special services: Point Bridge Co. v. Pittsburgh Rys. Co., 240 Pa. 105; Mahanoy City v. Hersker, 40 Pa. Superior Ct. 50; Gettysburg Boro. v. Gettysburg Transit Co., 36 Pa. Superior Ct. 598; Kittanning Boro. v. Nat.

Gas Co., 26 Pa. Superior Ct. 355. It was said in the last case cited, page 361: "if a corporation 'so carries on its business as to justify, at the hands of any municipality, a police supervision of the property and instrumentalities used therein, the municipality is not bound to furnish such supervision for nothing, and may, in addition to ordinary property taxation, subject the corporation to a charge for the expense of the supervision.'" The conditions requiring these special services were created by appellees, and the municipality was required to render them. Manifestly the conduct of appellees' business imposes on the municipality a special burden, of which the municipality has a right to be relieved.

It is objected that the ordinance imposes a tax under the guise of a license fee and was enacted purely as a revenue producing measure. The history of the ordinance is set forth by appellees to substantiate this theory. In the broad sense every ordinance which requires the payment of money is a revenue producing measure, but *the primary purpose of ordinances* such as this under consideration *is the reimbursement of the city* for providing special services to the licensees. The preamble of the ordinance in part reads: "Whereas, it is necessary for the City of Philadelphia, acting through its department of public safety, to furnish the services of firemen and policemen to protect the public safety at athletic contests and exhibitions, by assigning police and firemen to regulate traffic created thereby and to guard against fire within the premises used for such contests and exhibitions." Though we may suppose the ordinance was imposed to increase the revenue, this does not invalidate it as a licensing ordinance if it clearly appears the city is seeking to compel the persons who cause expense to pay for it.

With this fact established, we must consider the means by which a municipality may reimburse itself for the expense to which it is put in performing such services.

A license fee is a customary incident of municipal authority. A license fee is valid if the amount thereof is reasonably commensurate with the actual cost to the municipality for special services rendered: Western Union v. Phila., 22 W. N. C. 39; Allentown v. Western Union, 148 Pa. 117; Point Bridge Co. v. Pittsburgh Ry. Co., supra; Delaware and Atlantic Tel. & Tel. Co.'s Petition, 224 Pa. 55. The wage of policemen varies according to the length of service from $4.40 to $6.00 per day. The rate of $5.50 per man fixed by the ordinance is not excessive or unreasonable; it is based on a workday of eight hours and is the customary wage. From past experience, as well as by prior mutual arrangement, some 12 policemen under command of a sergeant were deemed necessary by the director of public safety of the City of Philadelphia and by appellee for the purposes heretofore mentioned. In addition, a considerable number of extra officers for the purpose of regulating traffic on streets neighboring appellees' parks, and for which no charge is made, were required.

However, it is contended by appellee that the ordinance involves a delegation of legislative authority in that the amount of the license fee is not fixed and determined by the ordinance, but is left dependent upon the number of men employed in performing the extra services for appellee; and that the number is wholly within the discretion of the director of public safety, an administrative official. Thus, it is pointed out, the amount of the license is in reality wholly determined by an administrative officer and not by the legislative body. If this conclusion is true, unquestionably the ordinance is invalid for the legislature may not delegate its law making authority; but an examination of the ordinance as related to the facts at once discloses that the means used to determine the amount of the license fees are similar to those involved in nearly all license legislation.

A rate is fixed, but the application of the rate is dependent upon extraneous facts to be found by an administrative official. Section 1 of the ordinance provides that the persons therein designated "shall pay ......a license fee based upon *a reasonable estimate* of the number of police and firemen which, in the opinion of the director of public safety, are necessary to protect the public safety at and on the premises...... at the rate per man of $5.50 per day." The rate and time are not seriously controverted, but the number that may be assigned is the question that gives apparent trouble. Generally speaking, in all cases where the reasonableness of the action of the administrative officer in fixing license fees is subject to the visitation of the courts, if the discretion lodged in such an official is abused, the courts will provide a remedy as the case arises.

From the very nature of the special services rendered no better or more definite standard could be fixed by council. A flat fee would tend to be arbitrary and unreasonable; such a fee might be commensurate with the services provided for one person and be wholly unreasonable and oppressive when considered in the light of services rendered another.

The administration of all taxing and licensing statutes is based on reasonableness as determined by some basic factor. In the levying of a realty tax, though the rate is fixed by proper authority, the basic factor is the value of the property to be taxed and that is determined by administrative officers. It is the determination of this value which fixes the amount of the tax. It is so with respect to telephone pole and wire license fees. The determination of reasonableness as to the charge is an administrative matter concluded by what is then considered proper. But this very element may change within a few months: what was then necessary may now be considered otherwise. In this case while the rate is definite, $5.50 per policeman required for an eight hour day, the base to which the rate is to be ap-

plied is left to administrative officers for determination: here the number of policemen necessary to maintain the public order, insure the public safety, protect and incidentally promote appellees' business. As was said in Buffalo v. Hill, 79 N. Y. App. Div. 402, 79 N. Y. Supp. 449, wherein an ordinance conferring discretionary power upon the city council of Buffalo was attacked on the ground that it placed no limitations upon the exercise of discretion: "The discretionary authority must rest somewhere, and experience has proven that its lodgment in some body or official of the municipality is more efficacious than to leave it with the Legislature, to whom the local situation may be unknown." See Fischer v. St. Louis, 194 U. S. 361; Gundling v. Chicago, 177 U. S. 183; In re Flaherty, 105 Cal. 558, 38 Pac. 981.

The case of O'Neil v. Ins. Co., 166 Pa. 72, is cited by appellees as governing the instant case. The preparation of a uniform contract policy of insurance was delegated to the insurance commissioner by the Act of 1891, P. L. 22. The act was held unconstitutional as a delegation of legislative power. The policy was to be the contract required by the parties by law and its use obligatory. The sole purpose of the act was the defining of the terms of the policy contract and enforcement of its use. No form had been drafted, but the whole matter was left to the commissioner with a penalty fixed for failure to comply with his requirements. In the instant case the purpose is declared, the subject-matter is definite, the acts to be licensed stated, the rate of the levy fixed, the official to levy named, the standard of reasonableness prescribed, and the penalty for disobedience determined. The ordinance is complete in the essential elements and only its application left to an administrative officer.

The O'Neill case frequently has been considered by this court, in its bearing on different legislation the validity of which was challenged because, it was claimed, it involved an unlawful delegation of legislative authority, and this court decided adversely to appellees' con-

tention. In Com. v. Puder, 261 Pa. 129, Mr. Chief Justice FRAZER pointed out the inapplicability of the O'Neil case to the situation when an act, regulating the business of lending money, vested in the commissioner of banking, the administrative function of exercising his discretion in granting licenses to applicants, if satisfied with their character and general fitness. To the same effect are Jermyn v. City of Scranton, 186 Pa. 595; Baldwin Township's Annexation, 305 Pa. 490. See also U. S. v. Grimaud, 220 U. S. 506.

Furthermore, appellee contends that the ordinance is discriminatory as offending our own and the federal constitution in that it (1) does not apply to forms of amusement and entertainment and other businesses where people congregate other than athletic contests, and (2) because it imposes no license fee on athletic contests where no admission is charged. As to the first ground, it seems hardly necessary to point out that there is a considerable difference between the necessity for policing athletic contests and other forms of amusement and entertainment, such as theaters, musical concerts, art exhibitions and the like. It is commonly known that larger numbers of people usually congregate at one time for an athletic contest than at places of other forms of amusement. The conduct of persons congregating at athletic contests is different from that of those attending other forms of entertainment. Considering the distinction made by the ordinance between athletic contests where admission is paid and where no admission is paid although police supervision may be necessary, we may point out that such a classification is not arbitrary nor without a sound basis. Where admission is charged, the maintenance of the exhibition or contest is in the nature of a business for profit, while in the case where no admission is charged there is present no suggestion of business. It is not without reason that where a profit is expected, and the whole purpose of the exhibition is to produce a profit, the city authorities should conclude

that it is improper to require the public to contribute to the success of the business to a greater extent than is necessary in the conduct of other businesses. It does not appear as unreasonable that the municipal authorities should require those who demand special services from it in order to conduct their businesses at a profit to pay for the additional services, and not burden other citizens of the municipality with the cost of such services.

Complaint is made that appellees are taxpayers and as such they are entitled to these services. In answer we may say it is true the city is obligated to render services to all taxpayers, but where that service is worked into the success of their business so that they may make a profit, a different question arises. There is a vast distinction between great public buildings which house thousands, great department stores where thousands visit daily, great industrial plants where tens of thousands are employed, who at noon and evening hours discharge on the public streets tens of thousands who need no extra police supervision, and an athletic contest such as a baseball game which imposes on the city an extraordinary expense. In brief the city should not be required to help defray the operating costs of a business of this kind.

An ordinance somewhat similar to the one here discussed was involved in Tannenbaum v. Rehm, 152 Ala. 494, and was sustained by that court. In that case the ordinance provided that "not exceeding four regular or special officers" might be detailed to attend any theater to preserve strict order, etc. We do not consider the presence of this maximum limitation feature essential to the validity of an ordinance of this kind because four policemen might be a wholly unreasonable number and the cost of their services an arbitrary levy for a license to operate a particular theater, while a proper number and expense therefore as to another theater.

Reasonableness of the administrative official's action is still the standard. We quote with approval from the

opinion of the Alabama Supreme Court: "The purpose of the ordinance is manifest. Its chief object is the protection of persons against the dangers of fire and the preservation of human life. Its enactment is an exercise of police power......The ordinance cannot be said to be unreasonable, in that the city assumes to designate the man to perform the particular service, or imposes the cost of such service upon the manager. The duty of protecting the person or citizen from dangers of fire in the exercise of the police power would seem to carry with it the right to employ the most effective means to that end, and this would include the right of designating competent agents or servants for the performance of such duty. The doctrine as to the right of the municipality to impose the cost of the performance of such services by the firemen on the manager of the theater, as was done in the case at bar, was upheld in New Orleans v. Hop Lee, 104 La. 601, 29 South 214, and in the case of Harrison v. Baltimore, 1 Gill (Md.) 264. Of course, such cost or expense must be fair and reasonable." Any challenge to the feature of reasonableness and the cost required to be actually paid may be settled in an appropriate proceeding.

We are of the opinion that the ordinance in question was clearly within the police power of the municipality, and it is not unreasonable.

The decree is reversed and bill dismissed; costs to be paid by appellees.

DISSENTING OPINION BY MR. JUSTICE MAXEY:

The so-called "license fee" imposed by the City of Philadelphia on the two major league baseball clubs of that city clothes the department of public safety with the arbitrary and unrestricted power to fix the fee or tax. This tax and the manner of its imposition are so completely repugnant to our federal and state Constitutions and to our entire theory of government that no decision of any American court has been or can be cited

to sustain it. An analysis of every case cited in the majority opinion will reveal that none of them sustains such an ordinance as this or anything like it. On the contrary, textbooks and court reports contain a wealth of material condemning such taxation as the city has resorted to in this case.

The ordinance challenged does not impose *a definite sum* either as a license fee or a tax upon each baseball game played. The fee in each case is $5.50 *multiplied by the number of policemen to be assigned to the game.* This latter shifting, unfixed factor is to be determined solely in each case by the director of public safety. If he says: "Ten policemen are to be assigned to tomorrow's game," the fee is $55. If he says: "One hundred policemen are to be assigned to tomorrow's game," the fee is $550. Clothing an administrative officer with the power to fix the fee or tax in this manner is violative of the principle that a state or municipal legislative body in authorizing the imposition of a license or tax must itself fix the amount of the fee or tax, either uniformly or by reasonable classification. This court held in O'Neil et al., v. Am. Fire Ins. Co., 166 Pa. 72, 77, 30 A. 943, that a law "must be complete in all its terms and provisions when it leaves the legislative branch of the government, and that nothing must be submitted to the judgment of the electors or other appointee of the legislature except an option to become or not to become subject to its requirements and penalties." We cited this with approval in Baldwin Township's Annexation, 305 Pa. 490, 158 A. 272. We there made a distinction between a "law" which is so far from complete that something must be supplied by an agency other than the legislature in order to make it complete, and a law which is complete in all its details but becomes operative only with the consent of the electors of a certain locality or, as in the Baldwin Township case, with the consent of the State Council of Education. In the case before us the ordinance imposing the license

fee or tax is not complete in all its details; before it becomes operative, the director of public safety must determine *the amount* of the fee to be charged. The ordinance itself is no more complete than is a signed check which is delivered to the payee named therein with the amount of the check left in blank. *This ordinance is as invalid as would be a state motor vehicle license law clothing the secretary of revenue with the power to charge each applicant for a license a fee based on the secretary's estimate of the number of miles of state highways the automobile licensed would be likely to traverse during the year.* The ordinance now in question introduced a new method of imposing a license fee or tax into our American system and no case anywhere sanctions this departure from the long established and constitutionally supported policy of making all license fees and taxes definite in the law imposing them.

The cases cited by appellants support the proposition that a taxing authority can impose a *definite* license fee or tax in certain contingencies. None of them supports the proposition that the fixing *of the amount* of a license fee or tax *can be delegated to an administrative official.*

There is absolutely nothing in the case of Point Bridge Co. v. Pittsburgh Railways Co., 240 Pa. 105, 87 A. 614 (cited in the majority opinion), which sustains the proposition that the power to fix a license fee can be legally entrusted to any official. No such question was before the court. On page 120 of the opinion written by Mr. Justice STEWART, there is the following sentence: "Whether in the absence of an ordinance establishing a license fee the city may recover from the defendant what it has paid for repair and maintenance of the bridge during all these years, and which it might have protected itself against by an ordinance requiring a license fee, is not before us, nor has it received discussion at the hands of court or counsel." The opinion in that case does, however, contain these significant sentences (page 117) : "A license fee based on such considerations

[i. e., evidence of fares and gross receipts of defendant] would be taxation pure and simple. The same objection would apply to the evidence admitted to show a commercial practice entitling the owners of a bridge to receive a certain annual return upon the money invested, and to the evidence of what other railway companies would require to pay for privileges, on other bridges like those enjoyed by the defendant on this."

The following eight cases are all cited either in the majority opinion or in appellants' paper book: Gettysburg Borough v. Gettysburg Transit Co., 36 Pa. Superior Ct. 598, involves the validity of a license fee of $50 per annum per trolley car operated by defendant. There was nothing indefinite about the amount of this fee, nothing left to the discretion of any officer or subdivision of the State. The same is true of the fees imposed in the following cases: New Hope Borough v. Western Union Tel. Co., 16 Pa. Superior Ct. 306, $1 for each pole and $2.50 for each mile of wire, per annum; Kittanning Borough v. Kittanning Consolidated Natural Gas Co., 26 Pa. Superior Ct. 355, $30 for each mile of pipes or mains per annum; Mahanoy City Boro. v. Hersker, 40 Pa. Superior Ct. 50, $3 per day on theatrical exhibitions; Delaware & Atlantic Tel. and Tel. Co.'s Petition, 224 Pa. 55, 73 A. 175, $1 per pole, $2.50 per mile of wire (in this case there was, in addition, provision for judicial determination of the reasonableness of the fee imposed, should any dispute arise). The following two cases cited by appellants do not relate to license fees or taxes. In Edgewood Borough v. Scott, 29 Pa. Superior Ct. 156, the ordinance required the obtaining of a permit—without charge therefor—before making excavations in a public highway. In Scranton City v. Straff, 28 Pa. Superior Ct. 258, the ordinance absolutely forbade the operating of any games of chances, shooting galleries, carousels, etc., in places of entertainment within 1,000 feet of any public park within the city limits. No fee was imposed or permit required.

The only case cited that even superficially seems to support appellants' proposition is that of Tannenbaum v. Rehm, 152 Ala. 494, but the differences between the ordinance upheld there and the ordinance challenged here are vital. There the mayor could designate policemen to attend the theater *only* at the request of the manager and the maximum number that the mayor could send was four; here policemen were sent to the outside of the park during a game whenever the director wished and in such numbers without limit as he designated. The baseball clubs were not even consulted in the matter. *There* the policemen did duty *inside the theater; here* they were *outside the park,* attending to their customary duties on the sidewalks and streets. There the mayor practically "loaned" regular or special officers to the theater and "for their services" the manager paid them; here policemen were not "loaned" to the management; the management had no control over them. The policemen merely did what policemen do when large crowds assemble as at political mass meetings, championship prize fights and baseball games, i. e., they preserved order. They were not paid for their services by the baseball club. They were paid by the city at the rate of $4.40 for an eight-hour day, and their services at the baseball park took about three-fourths of an eight-hour day. The director of public safety imposed on the plaintiffs a "license fee" or tax for each game equal to $5.50 for each policeman who was assigned to duty outside the park on the day of a game.

In the cited case of City of Buffalo v. Hill, 79 N. Y. S. 449, there was nothing indefinite as to the amount of the license fee imposed. It was $15 "before a person may engage in the sale of 'fish or salt meat outside of the public markets.' " The license was issued by the mayor upon the direction of the common council after a two-thirds vote of that body. The only question decided in that case was that the granting or refusing of a license was a valid exercise of the police power,

In the cited case of City of Allentown v. Western Union Telegraph Co., 148 Pa. 117, 23 A. 1070, there was nothing indefinite about the license fee imposed, which was $1.00 per annum on each telegraph pole, and $2.50 per annum on each mile of wire within the city limits. The city had no power to determine the number of poles or the number of feet of wire that the telegraph company should erect and maintain in the city. This was entirely within the power of the telegraph company. The telegraph company knew at all times what its license fee would be. The fee did not depend upon the judgment or "estimate" of any public official.

The cited case of Fischer v. St. Louis, 194 U. S. 361, held that an ordinance prohibiting the erection of any cow stable within the city limits of St. Louis, without permission from the municipal assembly, was a proper police regulation.

The cited case of Gundling v. Chicago, 177 U. S. 183, simply held that the ordinance of the City of Chicago authorizing the issuance of a license to persons to sell cigarettes on payment of $100, and forbidding their sale without a license, did not violate the Federal Constitution.

In the cited case of In re Flaherty, 105 Cal. 558, 38 Pac. 981, it was held that an ordinance forbidding the beating of drums on the street except on permit of the president of the board of trustees was not void.

The cited case of Com. v. Puder, 261 Pa. 129, 104 A. 505, upheld the validity of an act giving the commissioner of banking the discretion to grant a license to persons to engage in the business of loaning money. In that case this court held in an opinion by the present Chief Justice: "There are various statutes on our books in which discretion is given to a public official or board to determine the qualifications of applicants for license to carry on a particular kind of business......" There was nothing in the act then under review which gave the commissioner the power to determine the amount of the tax to be paid.

The cited case of Jermyn v. Scranton City, 212 Pa. 598, 62 A. 29, held that cities of the second class may, for purposes of taxation, classify real estate into three classes and levy a different rate for each of the three classes.

The cited case of Baldwin Township's Annexation, 305 Pa. 490, 158 A. 272 (supra), held only that the act making as a prerequisite to the annexation of part of a township to a contiguous city the consent of the State Council of Education was not unconstitutional. There was no question in that case as to giving anybody arbitrary power to impose a tax. We there maintained the well known principle that the legislature can delegate to the electors of a certain locality or to a board like the State Council of Education the determination of the question when a law *complete in all its details* shall become operative in a certain locality.

The cited case of United States v. Grimaud, 220 U. S. 506, held that the authority to make administrative rules is not a delegation of legislative power. There was no question in that case as to the fixing or imposition of any tax.

Authorities on taxation appear to be completely unanimous in condemning a license fee or tax whose amount is left to some administrative officer to fix. In a few instances where such laws have been enacted the courts have promptly declared them unconstitutional.

Cooley on Taxation, volume 1, 4th edition, section 78, says: "The powers which cannot be delegated to merely ministerial or judicial officers, include the selection of the property to be taxed, the determination of the purposes for which taxes shall be levied, *the fixing of the amount of the tax to be imposed* [italics supplied], the fixing of the rate of taxation, and the prescribing of the rules for taxation in general." Section 81: "Legislative power to tax cannot be delegated to mere administrative officers."

Section 57, 17 R. C. L., page 540, lays down this principle: "To accomplish the main purpose of a license law it is apparent that it should be definite and should name a fixed fee which all persons engaged in like business shall pay, and specify every essential condition of the license. The officer should be merely intrusted with the duty of issuing licenses to all who comply with the prescribed conditions."

Section 323, 12 C. J., page 839, lays down this principle: "The legislature cannot delegate its powers to fix the tax rate." In the case before us the council did delegate to the department of public safety "the power to fix the tax rate." It is true that the tax rate is "$5.50 per policeman assigned" but the department of public safety determines *the number of policemen to be assigned* at each game. If the council can lawfully do this, it can by ordinance say to any citizen: "If the department of public safety thinks you need extra police protection it can assign to you any number of policemen it sees fit and assess you $5.50 for every policeman so assigned and for each day of such assignment." The wealthy parent of a child who might be subject to kidnapping could under this system be made to pay a fee "based upon a reasonable estimate of the number of police and firemen which, in the opinion of the director of public safety, are necessary to protect the public safety at and on the premises of such" citizen. (The language quoted is from the ordinance in question.) Such a system is oppressive and tyrannical and is out of place in this country. "Under the Norman kings of England, the right to tax to obtain money for public uses was vested in the king, and was exercised by him at his own will. The money directed by him to be raised was assessed on persons or property by the officers of the exchequer, collected by the sheriff, and paid into the exchequer. The expenses of foreign wars increased the burden of taxation upon the English people, and, taxes becoming so onerous, there was resistance, and, by force, the power of

taxation was renounced by the crown, and conceded to the people": Inhabitants of Township of Bernards, Somerset County et al. v. Allen et al. (N. J.), 39 A. 716, 717. The case just cited holds that an act giving the governor the power to appoint "three resident freeholders, who shall assess and levy such taxes for such sums as they shall deem expedient" is unconstitutional. The Court of Errors and Appeals of New Jersey in that case cited Cooley on Taxation, page 50, as follows: ". . . . . . To leave to a state officer or board the power to determine whether a tax should be laid for the current year, or at what rate, or upon what property, prescribes no rule and originates no authority. It merely attempts to empower some other tribunal to prescribe a rule, and set in motion the tax machinery. This is clearly incompetent."

In Gautier v. Ditmar (Court of Appeals of New York), 204 N. Y. 20, 97 N. E. 464, it was held that the power of taxation is vested in the legislature. This power "consists of two distinct processes—the one relating to the levying or imposition of the taxes on persons or property; the other the collection of the taxes levied. The first is constituted of the provisions of law which determine or work out the determination of the persons or property to be taxed, the sum or sums to be thus raised, the rate thereof and the time and manner of levying and receiving and collecting the taxes. *It definitely and conclusively establishes the sum to be paid by each person taxed* [italics supplied]. . . . . .It cannot be delegated, except as the legislature may confer upon the municipalities or political divisions, which are through the local authorities representatives of the people and participants in the government of the state, powers of providing revenue for local governmental and public purposes."

In Bills v. Goshen, 117 Ind. 221, 20 N. E. 115, the City of Goshen passed an ordinance requiring a license in order to hold any public exhibition within the city ex-

cept certain educational, musical and artistic exhibitions. The ordinance declared: "License shall be granted by the mayor upon written application of any one, for any of the purposes aforesaid, upon the payment into the city treasury of *such sum of money as the mayor or common council shall determine in such particular case* [italics supplied] . . . . . ." The opinion cites Horr & Bemis on "Municipal Police Ordinances," section 13, as follows: "In exercising a power to license certain occupations the council should, by its ordinance, prescribe the exact occupation to be licensed, the amount of the fee to be charged, either uniformly or by reasonable classification, the condition upon which the license may be issued, and the duration of its validity." Section 263, same authority, says: " . . . . . .No discretionary powers should be vested in the officers whose duty it is to execute the provisions of ordinances, and the rule is entirely applicable to this class of ordinances. The ordinance itself should specify every condition of the license, and the officer should be merely intrusted with the duty of issuing licenses to all who comply with the prescribed conditions." The court said further: "It is therefore material to the validity of an ordinance that a fixed and definite license fee should be named in the ordinance, which all persons engaged in like business shall pay. Section 2 of the ordinance in question in this case is defective, in that it does not fix any amount to be paid as a license, but leaves it open for the common council to fix the fee to be charged in each particular case."

State ex rel. Wyatt v. Ashbrook et al. (Missouri), 55 S. W. 627. An act of the State of Missouri was attacked as defective in delegating to the commissioner named in the act the power to fix the amount of the license fee or tax. Section 5 provided that "the said board or officer in such city charged with the duty of issuing merchants' licenses, shall have power to fix the sum to be paid for licenses required by this act, but such license fee shall not be fixed at less than three nor more than five hun-

dred dollars for every class or group......" The Supreme Court of Missouri said: "......the authority to name and fix the amount of the imposition between those designated sums is plainly delegated to the commissioner, and can be exercised according to his arbitrary discretion in the premises, subject only to the qualification ......'that the license fee exacted shall be uniform in each city in which it is collected.' Until the commissioner acts and determines upon the rate of the imposition to be levied within the limits of the city for which he is appointed, no one of that community can determine from the law itself what the license fee or tax is or will be. *Until he acts, the rate of the tax is an unknown quantity. In fact, until he acts, there is no tax provided. An undetermined tax is in law no tax* [italics supplied]. The determination of the amount or rate of a tax to be imposed is as essential an exercise of the taxing power as the designation of the property to be taxed, or the time for its collection or enforcement." The court held that in this act the uniformity clause of the Missouri State Constitution was violated, which provides that all taxes to be levied "shall be uniform upon the same class of subjects within the territorial limits of the authority levying the tax, and that all taxes shall be levied and collected by general law." (This is practically identical with the provision in section 1, article 9 of the Pennsylvania Constitution.) The court said further that the uniformity clause of the constitution had been violated "not only by the arbitrary and unreasonable classification of merchants of a natural class, for the particular purpose of this particular imposition, and also on account of the discretion given to the commissioner to be named under the act to fix, in different cities, different license fees or rates of taxation upon the merchants of the same designated class, but the very uncertainty in the language of the act has introduced another element of possible and probable inequality and want of uniformity in the matter of determining the amount of the

tax to be fixed and imposed. In the exercise of the taxing power, which is the very essence of sovereignty, and of the gravest consequences to the citizen, there ought to be no ambiguity or uncertainty in the language of the law."

In Van Cleve et al. v. Passaic Valley Sewerage Com'rs, 71 N. J. L. 574, 60 A. 214, the court of errors and appeals passed upon an act which authorized the levying of a tax upon all persons within a certain sewerage district for an amount depending upon the judgment or discretion of the commission appointed under the act. The court declared the act unconstitutional as an attempt to delegate an essential element of the power of taxation. Judge GARRISON there said: "That the amount to be raised by taxation is to be based upon the expense incurred by the commission in construction and maintenance does not render the determination of the amount of taxation any less a matter that is committed to the judgment and discretion of the commissioners...... This court is unequivocally committed to the doctrine that the legislature of this state, in which the governmental power of taxation resides, does not possess the power to delegate to another body, having no governmental functions, the authority to determine, in its judgment or discretion, the amount to be raised by taxation, to which obviously must be added that such authority is in effect so delegated if such body may be empowered to levy taxes to the amount of an indebtedness to be incurred by it in its judgment or discretion."

There is no other power of government so jealously guarded by the people in their organic law as the power to tax. Nowhere is this power entrusted to the executive branch of government, not even in these days when unusual and extraordinary powers are being transferred by Congress to the President. Cooley in his "Constitutional Limitations," volume 2, 8th edition, page 986, says of the power to impose taxes: "No attribute of sovereignty is more pervading, and at no point does the

power of the government affect more constantly and intimately all the relations of life than through the exactions made under it." Chief Justice MARSHALL in M'Culloch v. Maryland, 4 Wh. 316, said that "the power to tax is the power to destroy." I can find no constitutional warrant and no justification in any sound view of public policy for entrusting any administrative officer of city, state, or nation, with this "pervading," "destroying" power.

That there has been no abuse of discretion charged against the director of public safety in this particular case is entirely immaterial. In the case of Miller v. Seare et al., decided in 1773, 2 Wm. Blackstone's Reports 1140,* page 1142, Chief Justice DE GREY aptly said on the subject of arbitrary power: *"Here,* little danger is to be apprehended from such a power of commitment, as the commissioners are usually men of knowledge and discretion, chosen by the Great Seal, and acting under its immediate inspection. The defendant, Mr. Seare, in particular, we all personally know to be a gentleman of the utmost integrity and honour. But, in the *country,* very low and obscure men often creep into the commission, and to arm them with such arbitrary powers would be of the most terrible consequence."

The investiture of any officer with arbitrary power cannot under our constitutional system be justified by the fact that the vested officer may not abuse it. The discretion vested in the director of public safety by this ordinance is one that can *not* under our federal and state Constitutions *be vested in any official.* The charge imposed as a license fee by the director of public safety is a "taking of property" according to his judgment or caprice and not "by due process of law." Cooley on "Taxation," 4th edition, volume 1, section 348, says: "As to the equal protection of the laws clause, it is beyond question that it applies both to license or business taxes and also to license 'fees.' "

Judge BROWN of the court below admirably summed up the evils and deficiencies of this ordinance when he said: "Even if council had authority to impose a fee for the services contemplated in the ordinance, it had no right to delegate to the director of public safety the fixing of the amount of the license. 'Notwithstanding express power may exist to enact, the ordinance must provide a uniform rule of action, it must contain permanent legal provisions, operating generally and impartially, for its enforcement cannot be left to will or unregulated discretion of the municipal authorities or any officer of the corporation.' Volume II, McQuillin on Municipal Corporations, 1580, section 728......This ordinance prescribes no conditions and provides no uniform rule of action. It does not fix the fee but gives the director of public safety absolute discretion to determine the number of police and firemen necessary 'at the rate per man of $5.50 per day.' It is true that the fee is to be 'based upon a reasonable estimate of the number of police and firemen which......are necessary,' but that rests entirely in his opinion."

Upon consideration of the arbitrary taxing power conferred on the director of public safety of Philadelphia by the ordinance now under review, my conclusion as to the latter can be appositely expressed in the language quoted by the United States Supreme Court in Yick Wo. v. Hopkins, 118 U. S. 356: "........an ordinance which clothes a single individual with such power hardly falls within the domain of law, and we are constrained to pronounce it inoperative and void." I think the ordinance challenged is clearly repugnant both to article IX, section 1 of our state Constitution which provides that: "All taxes shall be uniform, upon the same class of subjects, within the territorial limits of authority levying the tax, and shall be levied and collected under general laws......" and to the fourteenth amendment to the United States Constitution which declares: "......Nor shall any state deprive any person of life,

liberty or property, without due process of law; nor deny to any person within its jurisdiction the equal protection of the laws."

I would affirm the decree of the court below.