[PHILADELPHIA, MARCH 30th, 1839.]

## KACHLINE and Another *against* CLARK.

### IN ERROR.

On the trial of an issue *devisavit vel non*, evidence of declarations of the testator denoting angry and hostile feelings towards the principal legatees, made some months before the execution of the will and when he was in a state of excitement, was held not to be admissible to impeach the will: and it was held that evidence of his having, in a former will, given directions respecting the laying off of a portion of his farm for a burying-ground, and the erecting of a house in the burying-ground, was not admissible as a proof of insanity at the date of the will in question.

THIS was a writ of error to the Court of Common Pleas of the County of Bucks, to remove the record of the proceedings on an issue directed to that Court, to try the validity of a paper writing, dated the 23d of October, 1837, purporting to be the last will and testament of Joseph Clark, late of Doylestown township in the said county; in which issue Samuel Kachline and John B. Pugh were plaintiffs, and James Clark was defendant.

On the trial, before Fox, President, on the 16th of February, 1839, the plaintiffs proved the execution of the paper as a will, and read the same in evidence. The defendant then, for the purpose of proving the insanity of the testator, examined several witnesses; and among others Dr. C. H. Matthews, who testified as follows:

" I have known Clark ever since he came into the neighbourhood, and never saw his like. I always was his physician. I saw Clark the day after the will was executed. I asked him some questions about his health; he said, ' I am happy. I've made my will. Du Bois was here at 12 o'clock last night, and wrote it for me.' "

The defendant then offered to prove, by the witness, the conversation which took place between Joseph Clark, the widow, and the witness; objection being made, the Court overruled the objection, admitted the evidence, and sealed a bill of exceptions. The witness then proceeded as follows:

" Mrs. Clark said no; he was here yesterday; you have forgotten,

(Kachline v. Clark.)

Joseph. He persisted in his recollection with as much pertinacity as if he had been in health. He was very feeble at this time. This was about ten days before his death. His breathing was very difficult. I found him in a dull, stupid state. He was corrected by her, and the conversation followed. He afterwards began to tell me how he had left his property; some part of it, I knew, was accurate. He commenced by saying, 'I have given $150 per annum to my wife. She has been a dear good wife to me.' There was another bequest to his wife's son of $100. He said the little fellow had been to see him. He said, he cried very much at parting with him. The expression in regard to his wife struck me as something new, as I had repeatedly heard him say, during the latter part of the summer, in stronger language than I can speak, that she was one of the worst women in the world."

The defendant then offered to prove by the same witness, "in order to show insanity," that Joseph Clark had said some time before, that he would not leave his wife one farthing; which was objected to, but admitted by the Court; and a bill of exceptions sealed. The witness then proceeded as follows:

"At one time when he was talking, I heard him say, that he had taken an oath his wife should never have one cent. He was then in a high state of excitement against his wife. When he spoke of the bequest to Joseph, I thought it strange, for I knew he had turned him out of doors but a short time before, and had spoken of him in as furious terms as possible. He then spoke of James, the defendant, and the moment he mentioned his name, the fire was kindled. The prejudice was very strong, he was in a great state of excitement. He said he had not given him one cent. This also struck me as singular, as I had before heard him say, that Jem had helped him to earn every dollar he was worth in the world; that his son Joe had gone off and left him, and that he meant to reward Jem for it. His disease was consumption. He said he had named as his executors, Messrs. Pugh and Kachline. He said, 'I wanted you to be one, but it was on account of the woman.' He said, 'I'll send for Du Bois and have that altered yet.' The woman interposed, and said, 'Joseph, you must not, Dr. he is too weak.' I had very frequent conversations with him about the disposition of his estate. He was always making a disposition, or had made it when he talked to me."

The defendant's counsel, after having examined several other witnesses, offered to read in evidence, "for the purpose of showing insanity," certain parts of a paper writing purporting to be a last will and testament of Joseph Clark, dated 18th of January, 1837, and executed in the presence of C. E. Wright and C. E. Du Bois, Esquires. Whereupon the plaintiff objected; but the Court over-

(Kachline *v.* Clark.)

ruled the objection, and sealed a bill of exceptions.   The defendant then read to the jury the following extracts:

" Item. It is my will and I do order and direct, that in the east end of my garden a space 38 feet square inside of the walls, be walled around 4 feet high for the purpose of a family burial-ground ; and it is my will, that neither my son James nor his heirs or assigns shall, at any time hereafter, sell or convey the same, but shall be reserved for the use of myself and family forever.   And I do further direct that a vault be made in the middle of said enclosure, large enough for myself, wife and family, and that suitable grave stones be placed over the spot, when I shall be interred."

Extract from codicil—" I do further direct, that the burial-ground instead of being in the garden as directed by my will, shall be in the north east corner of my farm, back of the barn, and shall be 60 feet square, and walled as directed in my will.   The other directions therein expressed to be pursued as to the present scite.   I do also direct that a one-story stone house with a loft 20 by 17 feet, with a cellar beneath, shall be erected in the north east corner of said burial-ground, to be built by James Clark or his heirs."

The jury found against the will ; and the plaintiffs took this writ of error, and assigned for error the admission of the foregoing testimony.

Mr. *Ross,* for the plaintiffs in error, cited *Miller* v. *Miller,* (3 *Serg. & Rawle,* 267.) *Bouvard* v. *Wallace,* (4 *Serg. & Rawle,* 499.) *Wike* v. *Lightner,* (4 *Serg. & Rawle,* 203.)   *Nussear* v. *Arnold,* (13 *Serg. & Rawle,* 323.) *Moritz* v. *Brough,* (16 *Serg. & Rawle,* 403.) *Brown* v. *Molleston,* (3 *Wharton's Rep.* 129.)   *Hantz* v. *Hall,* (3 *Binn.* 511.)

Mr. *Chapman,* contra, cited *Irish* v. *Smith,* (8 *Serg. & Rawle,* 579.)

The opinion of the Court was delivered by

KENNEDY, J.—We are unable to perceive the relevancy of the evidence set forth in the first bill of exception.   The specific object of offering or admitting it, is not stated ; but still unless it appear to be in some way material to the issue joined, it ought not to have been received, after having been objected to by the counsel for the plaintiffs ; and more especially ought this rule to prevail and be adhered to, when there is reason to believe, that such evidence may either tend to confuse or mislead the jury.   The issue here was *devisavit vel non :* in support of the affirmative proposition, contained in this issue, the plaintiffs had given evidence going to show that the instrument in question, purporting to be the last will and testament of Joseph Clark, was duly executed by him as such ;

which cast the burden of repelling the evidence thus given by the plaintiffs, upon the defendant, by his giving other evidence; either going to show that Joseph Clark had not signed the instrument as his will, or if he had, that he was *non compos mentis* at the time, and, therefore, incapable of making a will; or that he was constrained to do so by improper force of some kind, and consequently not his voluntary act; or was induced to do it through the influence of fraud and circumvention practised upon him, and for this reason the writing was void: but the evidence excepted to did not tend to prove any of these things, and, therefore, ought not to have been admitted. It, at most, only went to show the singular humour and temperament of the man; and that it was difficult, if not impossible, for those around and connected with him, to please him at all times; which certainly would furnish no good reason for setting aside what he had committed to writing, and had declared and published to be his last will and testament.

The second bill of exception is the next error assigned. The evidence, to which it refers, was offered expressly, as it appears from the bill of exception, for the purpose of showing the insanity of Joseph Clark at the time he signed the writing in question; but it is not easy to imagine how such a declaration made by him some time before, could be regarded as evidence of his being insane then; nor indeed of his being so at any time. It might be evidence of his being very much displeased, at the time when he made it, with his wife for some reason or other; and that he was therefore resolved to leave her nothing at his death that he could deprive her of; but surely, instead of bespeaking insanity on his part, it rather went to prove intelligence, and a consciousness, at least, of his conjugal situation in life,—his being the owner of an estate, and his power to bestow it upon his wife or otherwise as he pleased. According to this evidence, which was admitted notwithstanding the objection of the plaintiffs' counsel to its being given, he said " he had taken an oath his wife should never have one cent:" when he said this, as the witness testifies, he was in a high state of excitement against her. It may be evidence of his great irritability and intemperance of feeling; but cannot well be considered evidence of insanity. But even, if it were, it was not so of his being insane at or about the time of signing the writing in question; and the circumstance of his not having carried such rash and intemperate determination into effect, in making the writing in question here, whereby, instead of attempting to do so, he has given a considerable part of his estate to his wife, would go to prove that he was in this respect, at least, restored to a state of sanity when he made it. Men of choleric constitutions, such probably as Joseph Clark would seem to have been, are considered in law as capable of making wills and deeds, and thereby disposing of their estates as those possessing the most temperate, sedate and discreet minds. For this purpose, it is not

requisite that a person should possess any great degree of strength of mind: nor is it necessary that he should, at the time of making a deed or a will for such purpose, retain all the force of intellect, which he may have had at any former period of his life : it is sufficient if he be capable of bringing to the view of his mind all his relations and other persons with whom he has been acquainted in life, as also the nature and extent of his estate, knowing what it consists of, and that he has the power to dispose of it as he pleases. In other words, if he still be possessed of mind sufficient to comprehend and advise as to the ordinary transactions of his life, and to give directions how his business shall be conducted and his estate managed, he may very well be considered competent to make a will disposing of all his estate ; and this much must be presumed of · every man until the contrary shall be clearly proved.

The only remaining error is the third bill of exception to the opinion of the Court below, overruling the objection of the counsel for the plaintiffs, to the evidence therein mentioned as offered by the defendant. The offer was to read in evidence certain specified parts of a former writing, made by Joseph Clark, purporting to be his last will and testament, for the purpose, as it would seem from the bill of exception, of proving that he was insane when he made the writing in question here. Though the provision made by those parts of the former writing offered and read in evidence, for laying off a small portion of his farm for a burial-ground, and the direction thereby given to build a house in a certain corner of it, without specifying the design of the house, may be thought somewhat singular, and to have proceeded from some peculiarity of mind in relation thereto, yet *per se* it cannot be said, that they go to show that he was insane even when he directed them to be inserted, and still much less do they tend to prove any symptom of the kind, when he left them out of the writing now in question. Those parts, therefore, of the former writing were improperly admitted in evidence to the jury. Such matters are only calculated to distract, or to mislead their minds in relation to the real point in issue ; and being thus of a dangerous tendency, ought not to have been received.

The Judgment is therefore reversed, and *venire facias de novo* awarded.

Judgment reversed, and a *venire facias de novo* awarded.