## Commonwealth v. Paul

*J. Alfred Wilner*, for Commonwealth.
*F. R. S. Kaplan*, for defendant.

SOFFEL, J., December 7, 1937.—J. L. Paul, trading as the Sharpsburg Coal and Iron Company, operates a place of business in the Borough of Sharpsburg. On April 19,

1937, said J. L. Paul was arrested and charged with violation of ordinance no. 12 of the Borough of Sharpsburg, adopted and approved November 18, 1935. The ordinance provides that no person, firm, or corporation shall engage in the business of a junk dealer, either purchasing or selling junk, or in the business of operating a junk yard, within the limits of the Borough of Sharpsburg, without first having obtained a license. The ordinance also provides for an annual license fee in the sum of $125. On May 4, 1937, defendant appeared before Justice of the Peace James A. Hernon and was found guilty of violating said ordinance and was fined $25 and costs, or, in default thereof, to be committed to the county jail for a period of 30 days. The case is now before the county court on appeal from said summary conviction.

The case presents two questions: First, whether defendant, J. L. Paul, was engaged either in purchasing or selling junk or operating a junk yard within the limits of the Borough of Sharpsburg on April 19, 1937; and, secondly, whether the license fee of $125 required under said ordinance is so unreasonable as to be construed as a revenue measure, rather than regulatory.

We shall consider these questions in the order stated. In order to determine whether defendant was engaged in purchasing or selling junk or in operating a junk yard, it is essential first to define the terms "junk", "junk dealer", and "junk yard". The term "junk" is of nautical origin. It is ordinarily defined as follows:

"Worn-out and discarded material in general that may be turned to some use; especially, old rope, chain, iron, copper, parts of machinery, and bottles, gathered or bought up by tradesmen called junk-dealers": Century Dictionary and Encyclopedia.

"Old iron, glass, paper, cordage, or other waste which may be treated so as to be used again in some form": Webster's New International Dictionary.

"At the present time the term means worn out and discarded material in general that may be turned to some

use; odds and ends; old iron, or other metal, glass, paper, cordage, or other waste or discarded material, which may be treated or prepared so as to be used again in some form; rubbish of any kind; especially, old rope, chain, iron, copper, parts of machinery and bottles, gathered or bought up by tradesmen, called 'junk dealers' ": 35 C. J. 127.

Derivatively, a "junk dealer" is defined as a dealer in junk, a person who deals in old materials, ropes, rags, etc., or one who is engaged in the business of buying and selling junk: 35 C. J. 127; the keeper of a junk shop: Century Dictionary and Encyclopedia. It is thus apparent that the term "junk dealer" denotes a person or tradesman who gathers up and buys junk. "Junk yard" is defined as "a yard used in connection with the business of dealing in junk": 35 C. J. 127.

That a municipality or borough, in the exercise of its police power, may regulate the business of dealing in junk has been established by a long line of decisions: City of Pittsburgh v. Streng, 90 Pa. Superior Ct. 288, and cases therein cited.

Ordinances which, in the exercise of police power, attempt to regulate the "junk" business must be reasonable, and the license fee charged must be commensurate with the cost of regulation or inspection. The ordinance cannot be a revenue measure under the guise of a police regulation: City of Allentown v. Western Union Tel. Co., 148 Pa. 117, 119; America Baseball Club of Phila. et al. v. Phila. et al., 312 Pa. 311; Kittanning Borough v. Consolidated Natural Gas Co., 219 Pa. 250; Delaware & Atlantic Telegraph & Telephone Company's Petition, 224 Pa. 55; Kittanning Borough v. American Natural Gas Co., 239 Pa. 210; Rock v. Phila. et al., 127 Pa. Superior Ct. 143; Kittanning Borough v. Kittanning Consolidated Natural Gas Co., 26 Pa. Superior Ct. 355.

In order to determine whether or not defendant is a junk dealer or operates a junk yard within the terms as used in the ordinance, it is necessary to consider the gen-

eral character and scope of his business. The testimony in the instant case establishes the fact that defendant is engaged in the coal business; that he has conducted said business within said borough for a period of approximately 25 years. In connection with said coal business, he purchases from time to time pipes, beams, rods, and structural steel from dismantled buildings. Defendant testified that five years ago he was engaged in the junk business, but since that time had given it up, and at the time the arrest occurred in the instant case he was not in the junk busines, but dealt in construction materials as a side line to his coal business. He admitted that he had on his premises shears left over from his junk business, which, he stated, had not been operated since he quit the junk business, and which had recently been repaired for the purpose of sale.

The Commonwealth's case rested upon the following evidence: Invoices and checks in payment thereof were produced to show that on July 30, 1935, defendant sold to the Borough of Sharpsburg one 18-foot steel I-beam weighing 800 pounds, at the cost of 2 cents a pound; on July 31, 1935, one lot of reënforcing rods, weighing 650 pounds, at 2 cents a pound; and on August 19, 1935, reenforcing rods, weighing 775 pounds, at 2 cents a pound. It is to be noted that all these purchases were made prior to the date of the adoption of the ordinance in question. It was admitted by defendant that he was engaged in the business of selling pipes, rods, and beams of the character described in the invoices. Testimony was also produced to describe the premises of defendant, to the effect that in defendant's yard were to be found pipe, beams, and similar articles. There was further testimony that in 1937, at the time the information was made, the premises looked substantially the same as at the times when the purchases were made. Certain photographs were offered in evidence showing defendant's yard. With the exception of the shearing machine and a pot or pan which defendant contended was used in the coal business,

the photographs show only construction materials, such as pipes and beams, arranged in a rather orderly fashion. Rocco Belsito, chief of police of the borough, testified that he had seen the shearing machine in operation in the last six months. Defendant stated that the recent operation of the shearing machine was for the purpose of trying it out in order to ascertain whether the repairs had been properly made. This, in brief, is a resumé of the evidence introduced in the instant case.

Our examination convinces us that defendant is not a junk dealer and does not operate a junk yard within the terms of the ordinance. It is true that defendant, in addition to his regular business of coal dealer, did handle materials that were second-hand, such as steel or iron beams, pipes, and rods. There was no evidence that defendant purchased said materials from peddlers or transients. There was no evidence of the sale of any goods, other than the I-beam and reënforcing rods indicated by the invoices of July and August, 1935. The prices charged were approximately the prices charged for new material. According to the testimony of defendant, the scrap prices would have been at the rate of $10 per gross ton, as against 2 cents a pound, as shown in the invoices.

It seems that there is a distinction to be drawn between a dealer in second-hand materials who buys metals like beams and pipes, and one who may buy pieces of scrap metal that might readily be pilfered or stolen and carried away to be sold by the thief. There was no evidence introduced to disprove the contention of defendant that his business covered merely the sale of coal and construction materials. There was no evidence of any kind that defendant scrapped materials, or that he sold them to scrap brokers, or that in his own hands these materials were changed in form. The only evidence of sales is that of the sales to the borough of the articles described in kind apparently to be used as such, said sales occurring prior to the adoption of the ordinance in question. Our analysis of this evidence convinces us that it is insufficient to con-

vict defendant either as a junk dealer or as maintaining a junk yard.

In the case of The City of New York v. Vandewater, 113 App. Div. 456, in drawing a distinction between the sale of second-hand material and junk, the court states the following:

"If the mere fact that one purchases and sells material which may be generically described as old iron brings him within the purview of the ordinance, then the defendant was liable. But whether or not he is within the ordinance should rather be determined by the general character and scope of his business. (*Commonwealth* v. *Farnum*, 114 Mass. 267; *Eastman* v. *City of Chicago*, 79 Ill. 178; *Commonwealth* v. *Ringold*, 182 Mass. 308.) The respondent deals in scrap iron and steel, and purchases articles like boiler tubes, axles, car wheels, switches, tracks, crossings, steel frames of buildings, sections of elevated railroad fabrics and of bridges, all of great bulk and weight, which he ships to mills and furnaces. He does not buy or sell single pieces of iron, and the smallest purchases shown were one of two barrels of horseshoes and one of four tons of such articles. I think that such a traffic is not that of a junk dealer. Junk, originally a nautical term, meant old rope or cordage, and it has been extended to mean cast-off odds and ends, like scrap iron, old bottles, metals, glass, and the like. (*Commonwealth* v. *Ringold*, supra; 4 Words & Phrases Judicially Defined, 3874.) It is quite clear that section 22, after the use of the general term 'junk,' does but define it by the further terms, 'old rope, old iron, brass,' etc. The fact that a thing is composed of old iron or old steel does not make it junk. It is the size and character of the article rather than its composition that must determine whether it is within that term. It may not be easy to define the term because it covers nondescript articles, but it is not difficult to determine whether an article is within it. It seems to me clear that the general character and scope of the business of the defendant does not fall within the description of a dealer

in junk. There is a radical difference between the buyer of great masses of metal weighing tons at a time, parts of railroad equipment, sections of elevated railroad structures or bridges and the like, and one who may buy old bottles, scraps, or pieces of metal, slush, old rope and the like, which might readily be pilfered or stolen and carried away to be secretly sold by the culprit. It is the business of this character that is to be licensed, located, regulated and made subject to the scrutiny of the police authorities. The business of the respondent is not necessarily within the terms of the ordinance, while the reasons for the enactment of it and the further sections of regulation do not exist."

In view of our conclusion that defendant neither operates a junk yard nor acts as a junk dealer, it is unnecessary, for the purpose of this decision, to consider the second question as stated, namely, whether the license fee is a reasonable charge or is in effect a revenue measure. Notwithstanding that fact, we deem it advisable to consider at this time the matter of fee. In the instant case defendant, in attempting to prove the ordinance was unreasonable, called Rocco Belsito, Chief of Police of the Borough of Sharpsburg, to show the cost of enforcing the given ordinance. It was shown by this witness that the premises in question were outside the regular beat of a police officer; that a night patrolman who worked 10 hours daily consumed at least five minutes out of each hour in patrolling said premises, and that said officer received a salary of $1,800 per year; that on the basis of time consumed in patrolling defendant's premises the cost to the borough would be $150 annually. The chief further testified that the police radio car made several trips daily around the premises. In addition, it was shown that the borough maintained a special light near the premises, and that the maintenance of the light cost the borough $36 annually. It was also shown that the health officer made daily visits to the environs of the premises. However, so far as this officer is concerned, we conclude

that any attempt to apportion part of his $1,440 annual salary to inspection of defendant's yard is without merit. No evidence was introduced at the trial of the case which negatives this evidence. In his brief, counsel for defendant has pointed out the fact that similar ordinances in other boroughs and cities of Allegheny County impose a license fee that is less in amount, and that the majority of them fix the renewal fee at a lower rate than the initial fee. We are not prepared to say that evidence of this character, if introduced at the trial of the case, would be sufficient to overcome the weight of the evidence introduced by defendant's witnesses.

We therefore conclude that defendant must be found not guilty of violating the ordinance in question.